489 A.2d 96

**ANNE ARUNDEL COUNTY, Maryland**

**v.**

**George H. EBERSBERGER, Jr., et al.**

**No. 991, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

March 15, 1985.

Karen A. Murphy Jensen, Asst. County Sol., Annapolis (Stephen R. Beard, County Sol., Annapolis, on brief), for appellant.

L. Dale Burgmeier, Annapolis (Burgmeier, Buppert & Downer, Annapolis, on brief), for appellees.

Argued before MOYLAN, WILNER and WEANT, JJ.

WILNER, Judge.

This case arises from a dispute among the residents of the Indian Hills community in Anne Arundel County. It concerns their community swimming pool. A majority of the homeowners persuaded the county government to enact an ordinance that could, if implemented, require all the property owners in the community to pay for the reconstruction and maintenance of the pool through annual special benefit taxes levied against their property. That did not sit well with at least four of the homeowners; in a bill for declaratory judgment filed in the Circuit Court for Anne Arundel County, they challenged the ordinance as being both *ultra vires* and unconstitutional.

After a hearing, the court found it unnecessary to address the constitutional issues; it agreed with the plaintiffs that the ordinance was *ultra vires* and, for that reason, declared it invalid. From that judgment, the county has appealed.

The underlying facts are not in dispute.

The pool in question is owned by the Indian Hills Community Association, Inc., a private membership corporation consisting of the property owners in the Indian Hills community. The pool, along with the land on which it sits, was deeded to the Association in 1973 by the developer of the community; it was opened in 1974. In accordance with an express provision in the deed, use of the pool was restricted to the members of the Association and their guests. It is a community, not a public, pool.

For a time, the pool was supported by voluntary contributions and the purchase of "pool bonds" by various members of the Association. Apparently, those contributions and purchases proved insufficient to maintain the pool in proper

condition, for in 1982 the pool was closed for health reasons. Because the pool does not comply with certain county health regulations, it cannot be reopened without substantial reconstruction and repairs, estimated to cost between $80,000 and $100,000. At some point, the Association succeeded in obtaining a commitment for a $100,000 loan, to be repaid over a period of fifteen years with interest at 13% per annum. The commitment letter itself is not in the record; whether it is still in force is not clear.

Md.Code Ann. art. 25A, § 5(O) authorizes chartered counties, of which Anne Arundel is one, "to establish, modify, amend and abolish special taxing areas for any of the purposes enumerated in this article...." Acting pursuant to that authority, Anne Arundel County has established a statutory scheme for the creation, amendment, operation, and abolition of special taxing areas. Section 17–700(a)(1) of the County Code authorizes the county council, by ordinance, to establish "special community benefit districts," to "furnish and provide special privileges or benefits to persons or property in such districts," and to "levy special taxes or assessments upon property in such districts receiving special benefit to pay the costs of furnishing, providing and maintaining such special privileges or benefits."

In order to carry out the functions delegated to such a district, the "board of directors of the civic or community association representing a majority of the property owners in the district" must, each year, prepare a proposed budget conforming to the requirements of the county budget office. The proposed budget must be submitted to all property owners in the district for comment and then to the county budget office. The proposed budget must provide, among other things, the "rate of special community benefit tax" which, together with any unencumbered surplus in the district's special community benefit fund, will support the proposed expenditures. County Code, § 9–200. If the proposed budget is approved, the special community benefit tax provided for therein is assessed against the property in the district on an *ad valorem* basis. It is collected by the

county along with the county and State real property taxes and is thereafter disbursed in monthly installments to the fiscal officer of the district. The proceeds of the special community benefit tax may be used only in accordance with the approved budget and for no other purpose. County Code, § 9–400(c).

In 1976, upon petition of a majority of the property owners and pursuant to these statutes and ordinances, the county council added a new § 17–703(*o*) to the County Code and thereby created the Indian Hills Special Community Benefit District. The district includes within it all of the property in the Indian Hills community and is therefore coextensive, geographically, with the Indian Hills Community Association. Although not specified in § 17–703(*o*), pursuant to § 9–200, the Board of Directors of the Association acts as the governing body of the district.

The "special privileges or benefits" accorded to the district in the 1976 ordinance were described in a "purpose" clause. The ordinance stated that the district was created

> "for the purpose of the construction, operation, maintenance and repair of certain community owned property and improvements within the boundaries of the district, including the resurfacing and sealing of the existing tennis courts, the installation of drainage pipe and drainage systems, the installation of a basketball court, the renovation of the log cabin by removing partitions, paneling walls, installing new windows, repairing ceilings, repairing and carpeting floor, correcting water problem in the basement, installing a new septic system, and installing, replacing and repairing recreation equipment as necessary."

Consistent with the general requirement of § 9–400(c), the ordinance specified that,

> "All special community benefit taxes collected for the district shall be used to defray the costs of construction, including the repayment of loans and interest therefor, and the maintenance of facilities in accordance with a

budget of the Indian Hills Community Association, Inc., or any other body administering the affairs of the district. Such tax funds may be expended for no purpose other than those specified above."

Seeing this format as the means of enabling the Community Association to borrow the money and renovate the pool, but apparently believing that the existing ordinance did not provide the requisite authority, a majority of the property owners in the district petitioned the county council to amend § 17–703(o) to add that, expressly, as a purpose and power of the district. This, the county council did by enacting Bill No. 97–83 on October 19, 1983. The bill added to § 17–703(o), as an additional purpose of the district, "the renovation and reconstruction of the community pool and its related facilities, including all related equipment, and the payment of the pool's yearly operational and maintenance expenses."

The district's operations under the 1976 ordinance were rather modest. The total budget for FY 1984, for example, amounted to $3,350 and required a special community benefit tax of only 3.7 ¢/$100 of assessable property. Upon adoption of the 1983 amendment, however, the Board of Directors of the Association, in January, 1984, proposed a budget for FY 1985 of $20,950, most of which was attributable to an appropriation of $16,400 for "Anticipated Pool Debt Service." To support that budget, a special community benefit tax of 38.3 ¢/$100 was required and proposed.

Article X of the Community Association by-laws requires an affirmative vote of two-thirds of the members to adopt a proposed budget. The budget submitted by the Board of Directors failed to get that support; more than one-third of the members rejected it. The Board thereupon prepared, submitted, and obtained approval of an amended FY 1985 budget containing no appropriation for pool debt service. That amended budget is the one that was submitted to the county and actually took effect.

The amended budget included, in place of the debt service item, a $9,300 appropriation for some emergency repairs, on account of which the special benefit tax was 7.8 ¢/$100. The parties agreed, however, that the actual impact of the debt service item was 30 ¢/$100, *i.e.*, if the Association were to exercise its authority under Bill No. 97–83 and borrow the money in accordance with the commitment, and if the debt service on that loan were to be paid from special benefit taxes, an additional 30 ¢/$100 of tax would be required. That rate, it was also agreed, would increase once the pool reopened and maintenance and operational costs were incurred.

As twice amended, the bill of complaint presented three issues: (1) whether Bill No. 97–83 contravenes the Fifth and Fourteenth Amendments to the U.S. Constitution, articles 15 and 24 of the Maryland Declaration of Rights, and art. III, § 40 of the Maryland Constitution by permitting taxes to be used for a private purpose; (2) whether the ordinance violates those same constitutional provisions by imposing a tax that would exceed the benefit conferred on the properties subject to it; and (3) whether the ordinance represented a valid exercise of the county's authority under Md.Code Ann. art. 25A, § 5.[1] The court, as we have noted, decided the case on the third ground.

No doubt for plausible tactical reasons, both sides have asked us to consider and rule upon both the constitutional and *ultra vires* issues. They would like to have the validity of Bill No. 97–83 presently and finally determined. Unfortunately, we are unable to oblige them. Under the circumstances evident in the record before us, we do not believe that there exists an actual, justiciable controversy. We therefore think that the bill of complaint, as amended, should not have been ruled upon at all, but dismissed.

---

1. In the initial bill of complaint, the plaintiffs also complained about the procedure by which the first proposed budget for FY 1985 was submitted for approval. That count was dismissed preliminarily and no issue is now raised about it.

Despite its long existence and frequent use, the Declaratory Judgment Act (Md.Code Ann.Cts. & Jud.Proc. art., §§ 3–401—3–415) does not spell out as clearly as it could some very basic limitations on its application. Section 3–403(a) authorizes a circuit court "within its jurisdiction [to] declare rights, status, and other legal relations whether or not further relief is or could be claimed." Sections 3–406—3–408.1 set forth some of the circumstances under which that power may be exercised, the heart of it being § 3–406, which authorizes the court to determine a question of construction or validity or to declare rights, status, or other legal relations under an instrument, statute, ordinance, regulation, patent, contract, or franchise upon complaint of a person interested therein or affected thereby. Those are not the exclusive circumstances, however. Section 3–403(b) states that the "enumeration in §§ 3–406, 3–407, 3–408, and 3–408.1 does not limit or restrict the exercise of the general powers conferred in [§ 3–403(a) ] in any proceeding where declaratory relief is sought and in which a judgment or decree will terminate the controversy or remove an uncertainty."

Finally, § 3–409, captioned "Discretionary relief," provides, with certain exceptions not relevant here, that

"a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:

(1) An actual controversy exists between contending parties;

(2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or

(3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it."

█ Notwithstanding these expansive and seemingly discretionary provisions, it has always been clear "that the existence of a justiciable controversy is an absolute prereq-

uisite to the maintenance of a declaratory judgment action." *Hatt v. Anderson*, 297 Md. 42, 45, 464 A.2d 1076 (1983). Addressing non-justiciable issues, the *Hatt* Court continued at 46, 464 A.2d 1076, "would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State."

 Whether a justiciable controversy exists depends, of course, on the facts presented to the court. Questions of "ripeness," on the one hand, or "mootness," on the other may be involved. One thing is clear, however: "In a declaratory judgment proceeding, the court will not decide future rights in anticipation of an event which may never happen, but will wait until the event actually takes place, unless special circumstances appear which warrant an immediate decision." *Tanner v. McKeldin*, 202 Md. 569, 579, 97 A.2d 449 (1953).

*Tanner* involved a declaratory judgment action filed by residents of Camp Detrick, a military reservation over which jurisdiction had been ceded by the State to the Federal Government. The plaintiffs complained that they were disqualified from voting in State and Federal elections in Maryland and from being appointed as notaries on the ground that, by virtue of their residence on the Federal enclave, they were nonresidents, and yet they were required to pay State income, sales, motor vehicle, and inheritance taxes and various local license fees. They sought a declaration as to their entitlement to vote and to be appointed as notaries and their liability for these various taxes and fees. The circuit court dismissed the bill and the Court of Appeals affirmed.

The complaints relating to voting privileges and income taxes were declared inappropriate for declaratory relief on the ground that specific statutory remedies were available. The other complaints, however, were found non-justiciable. The testamentary laws might change, said the Court; "[m]any things may happen before the death of the complainants." *Id.*, 579, 97 A.2d 449. Absent an indication

that the Governor intended to appoint them as notaries, their eligibility for such an office "does not present a justiciable issue." *Id.*, 580, 97 A.2d 449.

In *Hatt v. Anderson, supra,* 297 Md. 42, 464 A.2d 1076, a fireman sued to declare a county fire department regulation invalid. The regulation declared "[c]riticism of superior officers" to be a breach of discipline; Hatt argued that he was subject to that regulation, he could be disciplined for violating it, and it infringed upon his constitutional right of free speech. The record failed to show, however, that the regulation ever was applied or interpreted in the manner feared by Hatt. "At most," the Court concluded at 47, 464 A.2d 1076, "Hatt speculates as to what might happen under the regulation if he criticizes his superior officers." But that is "simply too theoretical, too abstract and too speculative to form the basis for an action for declaratory relief under the Act." *Id. See also Hamilton v. McAuliffe,* 277 Md. 336, 353 A.2d 634 (1976); *Liberto v. State's Attorney,* 223 Md. 356, 164 A.2d 719 (1960); and *cf. Pr. Georges Co. v. Bd. of Trustees,* 269 Md. 9, 304 A.2d 228 (1973).

This Court applied that principle in *Butler v. Liberty Mut. Ins. Co.,* 36 Md.App. 684, 375 A.2d 576 (1977). The plaintiff there was injured while a passenger in a vehicle insured by Liberty Mutual. He sued the driver of the vehicle, but, for whatever reason, Liberty Mutual denied coverage. While the tort action was pending, the plaintiff brought a declaratory judgment action to determine whether Liberty Mutual or his own insurer through its uninsured motorist coverage would be liable. We affirmed a dismissal of the bill, concluding that until the plaintiff recovered a judgment in the tort action which Liberty Mutual refused to pay there would not exist an actual controversy. "These contingencies may never come to pass," we said. *Id.*, 692, 375 A.2d 576.

This is not just a quirk of Maryland law. In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court had before it two declaratory judgment actions filed by

Texas residents, each seeking to invalidate the Texas abortion law. Roe, unmarried and pregnant, wished to terminate her pregnancy but could not do so lawfully under the Texas law. She presented a justiciable claim at the time her action was filed, and the Court took cognizance of it. The Does, who filed the other action, were a married couple who were childless and intended to remain so. The thrust of their complaint was that Mrs. Doe had been advised that pregnancy would present a serious risk to her health, that should she become pregnant she would desire to terminate the pregnancy, and that she would be unable to do so lawfully under the Texas statute. In contrast to Roe's situation, the Court found this entirely too speculative. The injury, it said, rests on "possible future" events that may never occur; "we are not prepared to say that the bare allegation of so indirect an injury is sufficient to present an actual case or controversy." 410 U.S. at 128, 93 S.Ct. at 714.

To the same effect, *see Socialist Labor Party v. Gilligan*, 406 U.S. 583, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972), in which the Court declined to consider constitutional challenges to a law where "[n]othing in the record shows that appellants have suffered any injury thus far, and the law's future effect remains wholly speculative." *Id.* at 589, 92 S.Ct. at 1720; and *see also International Longshoreman's Union v. Boyd*, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954); *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *Metzenbaum v. Federal Energy Regulatory Com'n*, 675 F.2d 1282 (D.C.Cir.1982); *Clark v. Valeo*, 559 F.2d 642 (D.C.Cir.), *aff'd sub nom Clark v. Kimmitt*, 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977); *Rhodes v. Laurino*, 601 F.2d 1239 (2d Cir.1979).

■ That, in essence, is what we have here. Putting aside the question of whether Bill No. 97–83 was even necessary to enable the district to renovate the pool—

whether that authority is implicit in the 1976 ordinance which is not being challenged—the fact is that the 1983 ordinance does not *require* the district to renovate the pool; it merely *authorizes* such work. Nor does it specify any particular means of financing the renovation. There is certainly no assurance, from the record now before us, that a budget containing an appropriation for the pool will ever be approved or that a special benefit tax to support such an appropriation will ever be levied.

At least until the prospect of such an appropriation or such a tax becomes substantially more certain, the plaintiffs will have suffered no injury from the challenged ordinance, and its validity or invalidity is therefore of no practical consequence. This is particularly so in light of the basis for the circuit court's ruling, namely, that "the pool was not a part of the development of a comprehensive recreational program." Whether that would remain true at such time as the district might effectively choose to renovate the pool is anyone's guess.

The one clear instance in which the Court of Appeals departed from the strict application of this requirement was *Liss v. Goodman,* 224 Md. 173, 167 A.2d 123 (1961), but we think that case presented a unique situation and is distinguishable. The issue there, raised in a declaratory judgment action filed by members of the Baltimore City Council, was whether the City Council could reject a proposed ordinance of estimates once submitted to it by the Board of Estimates. The council members expressed a clear intention to do so if the Council had the power; the City Solicitor had declared that the Council lacked the power. Though confirming the principle that the declaratory judgment procedure "should not be used to decide purely theoretical questions or questions that may never arise" (*id.,* 177, 167 A.2d 123), the Court concluded:

> "We think the question here is not theoretical but practical. The Council has asserted a right to reject or return the ordinance when submitted. To do so in the closing days of the year without a prior adjudication might well

cause an impasse and seriously affect the City's financial needs and obligations. It would seem to be peculiarly appropriate to have the issue resolved in advance. Other courts have indicated that declaratory relief is appropriate where public agencies are at loggerheads."

*Id.*, 177–78, 167 A.2d 123; *compare Bishop v. Governor*, 281 Md. 521, 380 A.2d 220 (1977).

That is not the case before us. We do not have the prospect of annual confrontations between public bodies in which the very operation of government or the security of public obligations may be placed in jeopardy. Indeed, it is interesting to note that, when the initial FY 1985 proposed budget was presented to the Community Association members for approval, the Treasurer made clear that the additional tax for the pool debt service "will not be collected if pending litigation prevents the pool construction project as per approved amendment to our District." It would appear from this that, however desirable an advance ruling on the validity of the ordinance might be, it would in fact be possible to wait until the controversy becomes real, if it ever does.

JUDGMENT VACATED; CASE REMANDED TO CIRCUIT COURT FOR ANNE ARUNDEL COUNTY WITH INSTRUCTIONS TO DISMISS BILL OF COMPLAINT, AS AMENDED; COSTS TO BE DIVIDED ONE–HALF TO APPELLANT, ONE–HALF TO APPELLEES.