507 A.2d 216

**BALTIMORE COUNTY, Maryland**

v.

**Michael J. BATZA, Jr., et al.**

**No. 1089, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

April 10, 1986.

Certiorari Denied July 24, 1982.

284

Patrick D. Hanley, Asst. Co. Atty. (Malcolm F. Spicer, Jr., Co. Atty. and Michael J. Moran, Asst. Co. Atty., on brief), Towson, for appellant.

Thomas G. Bodie (William F. Mosner and Power and Mosner, on brief), Towson, for appellees.

Argued before WILNER, ROSALYN B. BELL and KAR-WACKI, JJ.

WILNER, Judge.

We have before us in these cross-appeals a dispute between Baltimore County and some citizens of the county who reside in the Hampton community. The dispute arose from the county's decision to extend public sewerage into part of the Hampton community under a composite of ordinances and executive policies that would have the property owners benefited by the extension ultimately pay for about 52% of its $2.77 million cost. Upon the property owners' second amended complaint, the Circuit Court for Baltimore County declared the "legislative determination" that the owners bear 52% of the cost invalid and remanded the case to the County Council "for a redetermination of the proper amount of the assessment imposed upon the property owners."

In its appeal, the county gives us seven reasons why it believes the court erred; some of them, we think, have merit. In their cross-appeal, the owners make two other complaints, neither of which, in our view, has merit.

## BACKGROUND

In 1924, the General Assembly created the Baltimore County Metropolitan District for the purpose of providing adequate water, sewerage, and storm-water drainage systems to the populous areas of the county adjacent to Baltimore City. The Act—a comprehensive one—was described in some detail in *Dinneen v. Rider*, 152 Md. 343, 136 A. 754 (1927), where the Court upheld it against a multifaceted Constitutional attack. Essentially, the Act empowered the county commissioners—then the governing body of Baltimore County—to develop and implement a plan for constructing and extending water, sewer, and drainage systems in all those parts of the district "in which there is, in their judgment, a need for water supply, sewerage or drainage." 1924 Md.Laws, ch. 539, § 4.

To finance these projects, the county commissioners were authorized to issue bonds secured by the faith and credit of

the county, and to meet the debt service requirements of those bonds, the commissioners were directed (1) to assess a reasonable connection charge against property owners who connect to the public system, (2) to levy an annual front-foot assessment on all properties bounding on a road or right-of-way in which a line has been built, whether or not the property owner actually chose to connect to the line, (3) if those sources proved insufficient, to levy an *ad valorem* tax on all property in the district, and (4) if that proved insufficient, to levy an *ad valorem* tax on all property in the county.[1]

Notwithstanding the commissioners' ability to levy against property not affected by a particular project, the Court in *Dinneen* construed the Act as making it "mandatory upon the commissioners to collect *the entire cost* less the relatively insignificant amount receivable on account of the connection charge, by the front-foot assessment." 152 Md. at 361, 136 A. 754 (emphasis added).

The 1924 Act was amended a number of times by the General Assembly prior to the advent of charter government in Baltimore County in 1956. It now appears in § 307 of the County Charter and in §§ 34–11 through 34–78 of the County Code.

The charter provision merely allocates between the County Executive and the County Council the executive and legislative functions, insofar as governance of the district is concerned, that were formerly exercised by the county commissioners. It provides, in relevant part, that (1) the affairs of the district shall be administered as a division of the county department of public works, (2) the County Executive, or the chief engineer of the district acting under the authority of the County Executive and under the supervision of the county administrative officer, "in respect of the [district]" has "all duties and powers relating to the appointment and discharge of ... employees ..., the prepa-

---

1. The District did not and still does not include the entire county.

ration of all accounts and reports, the giving of notices, *the fixing of special assessments* and connection charges, and all other executive functions relating to day-to-day administration of the district...," and (3) the County Council, "in respect of the [district]" has "all duties and powers *relating to the approval of extensions* to the boundaries of the [district], the issuance of bonds ... by the district, and all over [*sic,* overall] legislative functions which [formerly] were vested in the county commissioners...." (Emphasis added.)

Several provisions of the County Code are pertinent. We start with §§ 34–27 and 34–28, which deal with the county's authority to undertake extensions that will not be self-supporting. Section 34–27 generally prohibits the extension of a water or sewer system unless the chief sanitary engineer of the district (who, on an *ex officio* basis, is the director of the county department of public works) determines that the project "will be financially self-supporting within a reasonable time after completion...." There are two exceptions to that requirement stated in § 34–27. One deals with extensions undertaken upon request of the property owners to be benefited by them. In such a case, the "property owners requesting [the extensions] shall finance their cost upon a basis that will make them a permanently self-supporting part of the [district]." The other proviso states that, where the county proceeds on its own initiative, the self-supporting requirement will not apply if the chief sanitary engineer:

(1) finds that the cost involved in the exercise of that authority "is not readily or fairly susceptible of allocation among property owners in the affected area" through connection charges and normal front-foot assessments;

(2) finds further that the exercise of that authority "is for a purpose necessary and useful to the operation or maintenance" of a water or sewer system "constructed or to be constructed" in the district; and

(3) "prepares a schedule of equitable apportionment of cost among the property owners in the drainage area benefited by such project in order that the difference between cost of such project and capitalized assessment may ultimately be recovered in lump sum payments from property owners as and when their lands are subdivided."

With particular regard to this third condition, § 34–27 requires that all property owners benefited by the project must be notified of the proposed apportionment of cost contained in the schedule and that, after a hearing, the county may adopt the schedule as prepared or amended. In any event, no levy may be made against a property owner of the amount apportioned to his property until his lands are subdivided.[2]

Section 34–28 provides another exception to the "self-supporting" requirement. It states:

"Whenever, in the opinion of the county health officer and the director of public works, it is necessary, for the protection of the public health, that the water supply and/or sewer systems be extended to serve existing housing units which previously had been permitted to be constructed without public water supply and/or sewer systems, the county is authorized to construct such extensions of said systems without meeting the requirement that such project be self-supporting; provided, all property owners affected shall have been given a public hearing by the department of public works and made aware of all costs that will be their responsibility prior to presentation of a resolution to the county council; and provided, the county council approves such extension by resolution duly adopted."

---

**2.** This third condition was added to the law in 1955. *See* 1955 Md. Laws, ch. 406. It would appear to have no application where the property to be served by the extension has, as here, already been subdivided. Whether it has the broader effect of making the whole exception to the "self-supporting" requirement inapplicable to subdivided property is not altogether clear. Neither side has addressed that question.

Sections 34–52––34–70, which comprise Division 3 of the law, deal with charges and assessments. Section 34–52 states that, for the purpose of paying the debt service on bonds issued to finance the construction of water, sewer, and drainage systems, the county is directed (1) to make a "proper and reasonable charge for connection" with the system, and (2) "to fix an annual assessment on all properties ... binding on a street ... or right of way in which a water main, sewer or drain has been built." The annual assessment "shall be made upon the front foot basis, except in situations where property owners have agreed with the county on another or additional basis of assessments upon their property under the provisions of section 34–27 of this Code."

For the purpose of assessing benefits, the county must classify assessable property into five categories—agricultural, small acreage, industrial or business, subdivision, and remote. Sec. 34–53. Benefit charges must be fixed in accordance with those classifications, sec. 34–53, and they must be "uniform for each class of property ... throughout the district." Secs. 34–55.

Section 34–69 provides that, when the owners of 60% of the assessable frontage of property along a road desire an extension of a water or sewer pipe or when the chief engineer determines that an extension is necessary "for health reasons" but the extension "so desired or so required will not be financially self-supporting unless a deficit deposit is made with the county," the chief engineer is to determine the amount of the deficit, which is then to be apportioned, on a front-foot basis, among "each of the owners of assessable frontage properties...." Those "charges" are to be added to the "assessment accounts of such owners" on or before April 15 following the availability of service from the extension. They are to be known as "Deficit Charges" and are to constitute a lien upon the properties until paid. The director of finance is empowered to add one-tenth of the charge (plus interest at the rate of 6% from the date the whole charge was levied) to each annual tax bill

and to collect that amount in the same manner and at the same time as State and county taxes are collected. Property owners are given the option of accelerating the ten installments in order to avoid the interest.

This statutory scheme clearly anticipates, and purports to require that, the full cost of water and sewer extensions be paid by the property owners benefited by the extensions. As a general rule, extensions are not to be made unless they will be self-supporting—i.e., that their full cost will be recovered from connection charges and the uniform special benefit assessments determined on a front-foot basis in accordance with the classification of the property. In those instances where non-self-supporting extensions are authorized, the deficit—i.e., that part of the cost that will not be recovered through connection charges and uniform special benefit assessments—must also be paid by the affected property owners, either through a special arrangement under § 34–27 or through an additional front-foot assessment.

In 1979, that legislative direction was modified. Upon recommendation of the director of public works (who, as noted, also acts as the chief sanitary engineer of the district) and "[i]n order to provide more meaningful relief for homeowners required to connect to sewer and/or water main extensions mandated by the Department of Health," the county administrative officer approved the following policies for all extensions mandated by the health department and undertaken after May, 1979:

"1. Except for extensions in geographical areas designated as Remote Areas by existing statutes, the prevailing Standard Rate shall be applied as the Benefit Assessment Charge.

2. Homeowners shall be responsible (except as noted in 3. below) for one-half of the calculated net deficit based upon relative front footage of each and the Metropolitan District will be responsible for the other half. By 'net deficit' is meant the calculated deficit less all outside contributions to the costs of an extension, as Federal and State grants.

3. No tax account shall be responsible for more than $600 on the first $5.00 per front foot of the homeowners' portion of net deficit responsibility."

No one has questioned the authority of the county administrative officer to effect this change of policy, and so we shall assume that it was not an *ultra vires* act. What it means essentially is that, where, for health reasons, the county acts under § 34–28 to extend a water or sewer line that will not be self-supporting, it will pay, from general district funds, one-half of the deficit. The property owners will continue to pay the connection charges, the "standard" front-foot special benefit assessment, and, through an additional front-foot assessment, the other half of the deficit. *That,* together with certain other adjustments not at issue here, is what produced the 52%/48% allocation of cost in this case.

With this background, we now look at the particular facts before us.

The Hampton area lies about midway between Towson, on the south, and Loch Raven reservoir, on the north. It was developed essentially in two stages: the earlier development, known simply as Hampton, was constructed either before or in the early 1950's and consists of lots of one-third acre or more; the newer development, built sometime in the mid-1950's, is known as Hampton Village and generally consists of somewhat smaller lots. The community lies within a single drainage area sloping from south to north. It is bisected by a stream (Hampton Branch) that flows north into Loch Raven reservoir. That reservoir is the major supplier of drinking water to the metropolitan Baltimore area.

Although the public water main was extended to serve the homes when the community was developed, the public sewerage system was unavailable at that time north of Towson. The homes therefore were built and sold with private septic systems and remain entirely dependent on them. Unfortunately, because of topography, soil condi-

tions, or a high water table, or some combination thereof, some of the land was not conducive to a septic tank system. Moreover, at least before June, 1956, county supervision of the location and installation of the individual septic systems was haphazard at best and poor at worst. Percolation tests were not required and inspections were sporadic; as a result, systems were placed where they should not have been placed. By 1958, many of the septic systems in the older section were proving inadequate. A county health department survey conducted in May, 1958, revealed that 43 out of the 53 homes visited "showed definite signs of failure." The department noted its concern that a number of owners had attempted to correct the problem by extending their drainfields, and that, "It is strongly suspected that many systems have been extended to conveniently located storm drains or streams. In so doing, the lawns were freed of nuisances but the effluent now reaches the Loch Raven reservoir by means of a more direct course."

For whatever reason, nothing of significance was done for nearly 20 years. In the meanwhile, a number of the residents installed "run off" pipes that allowed the effluent from their tanks to run into Hampton Branch. When, at various times, individual residents questioned the department of public works as to whether public sewerage could be extended, the response was that the sewer would be extended only upon petition of 60% of the property owners. Finally, another survey was made by the county health department which, on January 26, 1978, reported:

"The results of the survey revealed that of the 204 properties inspected, 63 had failing disposal systems. Some of these systems are being pumped frequently to prevent overflows. Many others are discharging sewage into storm drains and some directly to Hampton Branch. Bacteriological samples were collected from various points in the stream which resulted in high fecal coliform counts. These results are made more significant by the fact that Hampton Branch is a tributary of the Loch Raven reservoir.

It is estimated that the age of the disposal systems in this community is between 20 and 30 years. This suggests that more systems will fail in the near future. Most of these failing systems cannot be adequately corrected due to limited expansion area, poor soil conditions and/or shallow bedrock. Therefore, the only method of permanent corrections is with the extension of public sewers."

To prevent further degradation to Hampton Branch "and to prevent sewage pollution from entering this drinking water reservoir," the bureau recommended that "every effort be made to extend sewers to the gravity flow area of Hampton" and that, if necessary, the county proceed under § 34–69 (*see ante,* pp. 289–290).

This report finally got the slumbering and lumbering bureaucratic process moving. Shortly after February 16, 1978, the directors of public works, finance, and budget signed a "Project Directive" requesting funds for a "preliminary plan, cost estimate and report on the feas[i]bility of extending a sanitary sewer main in the gravity area of Hampton...." Two months later, they signed a revised "Project Directive" directing the preparation of construction drawings and specifications. As described in this directive, the project was estimated to cost $2,130,000, of which $1,305,000 would come from front-foot assessments. A deficit of $640,000 was projected, to be added, on a 40-year basis, to the property owners' tax bills. In September, 1978, the County Executive, in a letter to the President of the Hampton Improvement Association, noted that the project was still "in the early stages of design" and that at least three years would be required to complete the design, acquire rights-of-way, and secure necessary approvals for the commencement of construction.

When alerted that they would be expected to pay most of the cost of the project, either through the "standard" front-foot assessment, then set at $2.50 a foot, or through half the deficit charge, some of the residents challenged the

health department survey, voiced opposition to the extension, and began to search for alternative solutions to the problem. For a time, in 1979, work was halted on the project pending another survey by the health department. That survey was begun in May, 1979; ultimately, one-third of the homes were found to have failing sewage disposal systems. The sanitarian who conducted the survey concluded: "The occurrence of rock formations, high water table fluctuation, soil types, density of properties and problems with reconstruction of old systems all contribute to the pollution of the drinking water of Loc[h] Raven Reservoir. Public sewers are recommended at this time."

Notwithstanding this recommendation, the project remained in limbo. In March, 1981, the county health department informed the director of public works that it "continues its previous recommendations to extend sewers to the gravity flow area of Hampton," noting that soil conditions made "onsite corrections unfeasible." At some point in or before September, 1981, the county health department again certified the need for an extension, whereupon design work by the department of public works started up again. Plans were completed and approved in August, 1982, a construction permit was issued in April, 1983, and the project was advertised for bid in December, 1983.

The bid accepted by the county showed a net construction cost, after allowances, of $2.2 million. Of that amount, according to the county's financial analysis, $82,500 would be received from connection charges and $690,000 would come from the standard front-foot assessment, leaving a deficit of $1,432,000. Application of the 1979 policy would have the 150 residents to be served by the extension paying a total of $1.4 million ($82,500 connection charges, $690,000 standard front-foot assessment, and $682,500 deficit assessment) and the county paying $1.3 million.[3]

---

3. There are more than 150 homes in the Hampton community but only those in what is referred to as the "gravity area" will be served by the extension.

On January 31, 1984, a hearing was held for the purpose of discussing with the residents the financing of the proposed extension. From the brief "minutes" prepared by the director of public works, 49 residents appeared and all registered opposition to the project. Despite that opposition, the matter was presented to the County Council, which directed the county health department to conduct a resurvey to determine whether the conditions noted could be corrected by alternative means, without the need of public sewerage. The resurvey was conducted and confirmed that public sewerage was necessary. In light of that conclusion, and after several hearings and work sessions, the Council adopted Bill No. 20–84 on April 2, 1984.

Bill No. 20–84 was a Resolution of the Council approving the extension. In the "WHEREAS" clauses, the Council recited that the county health officer and the director of public works had "found it necessary, for the protection of the public health," to extend the sewer line, that "all property owners affected have been given a hearing by the Department of Public Works and made aware of all costs that will be their responsibility," that authority for the project was found in § 34–28 of the Code, and that the Council deemed it "necessary for the protection of the public health that said sanitary sewer system be constructed. . . ."

Twenty-six Hampton property owners responded with this lawsuit attacking Bill No. 20–84 and asking the court to declare it illegal and to enjoin the county from taking any action under it "until the conclusion of these proceedings." In their second amended complaint, they claimed that their septic systems and those of a majority of other residents in the area "are in efficient and sanitary working condition," that it was "not necessary for the protection of the public health" to extend the sewer line, and that any contrary determination by the county health officer or the director of public works was arbitrary. They argued further that (1) Bill No. 20–84 was arbitrary, (2) the bill was unconstitutional because they were not given a proper hearing as required

by § 34–28, (3) it was vague because it failed to specify the boundaries of the Hampton area and location of the proposed sewer extension, (4) it was invalid because the health officer and public works director had no adequate standards for determining whether the extension was necessary for the protection of the public health, (5) the county's decision to proceed under § 34–28 rather than § 34–27 denied them equal protection of the law, (6) the "failing systems" in Hampton were the direct result of the county's failure to supervise their initial installation, and (7) the primary purpose of the extension was to protect Loch Raven, it was therefore a "special benefit" to the general public, and, as a result, the assessment of the cost to the plaintiffs constituted a denial of due process of law.

After an evidentiary hearing, the court, on May 14, 1985, filed a memorandum opinion discussing and disposing of these issues and those raised by the county in defense. It rejected the county's arguments that (1) the action was premature because no assessment had yet been actually levied, (2) the plaintiffs failed to exhaust available administrative remedies, and (3) no relief was possible under the pleadings. It also rejected the owners' arguments that the extension was not necessary for health reasons, that the owners did not receive an adequate public hearing, and that the county was estopped from requiring them to contribute to the cost. Relying primarily on *Montgomery County v. Schultze*, 302 Md. 481, 489 A.2d 16 (1985), however, it accepted the plaintiffs' final contention that the allocation of cost was invalid because "the County Council did not consider that benefit accruing to the general public by reason of the improvement." It therefore concluded that "Bill 20–84 cannot stand as the basis of the assessment rendered against the residents" and, on that basis, in a separate order remanded the case to the County Council "for a redetermination of the proper amount of the assessment to be imposed upon the property owners...."

## THE ISSUES

The county, as we have said, raises seven issues in its appeal:

"I. From the standpoint of pleading, the court below should not have reached the merits of the assessment issue.

II. The evidence did not establish the existence of a justiciable controversy.

III. The exhaustion of administrative remedies doctrine prohibited the court below from reaching the merits of the assessment issue.

IV. Even if the court below should have reached the merits of the assessment issue, the Constitution does not require the County Council to fix and levy special benefit assessments.

V. Even if the court below should have reached the merits of the assessment issue, the Constitution does not require apportionment of the public/private benefit on a project by project basis.

VI. In any event, the court below did not have the power to remand the matter with instructions to reconsider the assessment.

VII. Even if the court below had the power to remand the matter, it was not proper to remand it to the County Council."

In their cross-appeal, the owners complain that:

"I. The Circuit Court ... erred when it refused to hold Baltimore County legally responsible for the nuisance that it had created over thirty years ago when Baltimore County permitted the installation of private septic systems in Hampton which did not comply with applicable State and County regulations.

II. The Circuit Court ... erred when it held that the meeting on January 31, 1984 at Hampton Elementary

School complied with the requirement of the Baltimore County Code that 'all property owners affected shall have been given a public hearing by the Department of Public Works.' "

## THE CROSS–APPEAL

We shall deal with the cross-appeal first, because it presents the easier issues.

### (1)

The Circuit Court viewed the owners' first argument as essentially one of estoppel—that, because the county, some 30–35 years ago, negligently permitted the septic systems to be located or built as they were, it should be precluded from requiring the owners to contribute to the cost of correcting the problem. In their brief before us, their argument is not so much one of estoppel, but rather that the failing systems constitute a nuisance and that the county "is legally responsible for the creation of, and failure to abate, such nuisance." In support of that proposition, they cite cases in which municipalities have been held liable for nuisances created by them, including nuisances arising from the negligent construction or operation of a public sewage disposal system. *See, for example, Livezey v. Bel Air,* 174 Md. 568, 199 A. 838 (1938).

It is true that, if a municipality proceeds to construct or operate a public sewage disposal system in such manner as to create a nuisance, it may be held liable for injuries arising from the nuisance and may, under certain conditions, be required to abate the nuisance. In addition to *Livezey, see Taylor v. Mayor & C.C. of Baltimore,* 130 Md. 133, 99 A. 900 (1917). But that is not the case here. This case is controlled by *Fowler v. Bd. of Co. Comm'rs,* 230 Md. 504, 187 A.2d 856 *cert. denied* 375 U.S. 845, 84 S.Ct. 98, 11 L.Ed.2d 72, *reh. denied* 375 U.S. 936, 84 S.Ct. 334, 11 L.Ed.2d 268 (1963).

Fowler sued the county commissioners of Prince George's County for failure to exercise their power to prevent and abate nuisances arising from faulty septic tanks in a nearby subdivision. The Court of Appeals, finding that the county was insulated by governmental immunity, affirmed the sustaining of a demurrer. At 507, 187 A.2d 856, it held:

"It is clear that when the Legislature delegates the police power with respect to the public health to a political subdivision, its governing body to the extent of the grant is invested with the sovereign power of the State; and when it acts, or fails to act, under that power, it does so in a governmental capacity....

It is equally clear that in Maryland, as in almost all common law jurisdictions, there can be no recovery against a municipal corporation for injuries occasioned by its negligence or nonfeasance in the exercise of functions essentially governmental in character.... The appellants attempt to escape the effects of governmental immunity by arguing that wilful or negligent failure to prevent or abate a public nuisance is an exception to the usual rule. The cases make it clear, however, that the exception has been recognized and applied (on the theory that the political subdivision is acting in a proprietary or municipal capacity and not as the agent of the State) *only where the nuisance has relation to public rights of way or other property* owned or maintained by the municipality.... It is apparent from the declaration that the claimed public nuisance was not on a highway or on municipally owned land."

(Emphasis added; citations omitted.) *See also Irvine v. Montgomery County*, 239 Md. 113, 117, 210 A.2d 359 (1965).

■ As in *Fowler*, we are dealing here with private septic systems on private property, not a public system or public property. What is being challenged is the exercise, or non-exercise, of a purely governmental function, and as to that, the county continues to enjoy immunity. *Austin v.*

*City of Baltimore,* 286 Md. 51, 405 A.2d 255 (1979); *Tadjer
v. Montgomery County,* 300 Md. 539, 479 A.2d 1321 (1984).

(2)

Section 34–28, as noted earlier, requires that affected
property owners be given a public hearing by the depart-
ment of public works and made aware of all costs that will
be their responsibility prior to presentation of a resolution
to the County Council.

On January 20, 1984, the director of public works sent a
notice to all affected property owners informing them that
(1) the department had received bids for a sewer main
extension to serve the Hampton area, (2) the project was
initiated by the county health department, (3) a resolution
approving the extension would be submitted to the County
Council at its next regular meeting, and (4) a public hearing
would be held at a stated time and place on January 31 "to
review the financing and discuss any questions with the
property owners." A "schedule of charges, showing the
cost to each property owner" was enclosed with the notice.
As noted, a hearing was, in fact, held on January 31, at
which 49 residents appeared.

■ The owners complain that the hearing was defective
because it came too late for them effectively to challenge
the underlying need for the project. The record does not
bear that out as a matter of fact and we are not prepared to
assume it as a matter of law. The evidence indicates that
the owners did indeed voice opposition to the project and
that the county officials listened to and understood that
opposition. That they were not convinced by the owners'
arguments does not render the hearing invalid. We must
assume that, had the owners made a more persuasive case,
the county officials would have acted differently. In any
event, there would be no practical way to inform the owners
of their share of the costs until the project was bid, and it
could never get that far without a certification of need by
the health department. We find no merit to the complaint.

THE COUNTY'S APPEAL

(1)

Of the seven issues raised by the county, three (I, II, and III) are essentially procedural in nature; they challenge either the owners' pleading—the second amended complaint—or their standing to bring the action. Issues IV and V go more to the substance of the controversy—whether the court was correct in its application of *Montgomery County v. Schultze* and in its conclusion that the 52%/48% allocation of cost was invalid. The last two issues relate primarily to the remedy chosen by the court—remand to the County Council with instructions to reconsider the allocation.

(2)

■ A number of these issues overlap and cannot easily be decided piecemeal. We therefore shall treat them together. One that is clearly distinct is issue II—whether there is, in the first instance, a justiciable controversy. We think that the county is completely wrong in its assertion that, because the assessment against the owners will not actually be levied until the completion of construction, there is not yet a justiciable controversy. Its reliance on *Anne Arundel County v. Ebersberger*, 62 Md.App. 360, 489 A.2d 96 (1985), is misplaced.

*Ebersberger* rested on the premise established in *Tanner v. McKeldin*, 202 Md. 569, 97 A.2d 449 (1953), that a court will not ordinarily decide future rights in anticipation of an event that may never occur, "but will wait until the event actually takes place, unless special circumstances appear which warrant an immediate decision." *Tanner*, 202 Md. at 579, 97 A.2d 449; *Ebersberger*, 62 Md.App. at 368, 489 A.2d 96. That, indeed, was the case in *Ebersberger;* the plaintiff was challenging an ordinance that authorized an assessment that might never come to pass. There is nothing uncertain or contingent about the assessment in this case. Construction of the sewer main extension is proceeding; absent some entirely unforeseen circumstance, it will in due

course be completed, whereupon the assessment, as presently and objectively calculated, will be levied pursuant to law. The mere fact that some time will elapse between the authorization for the assessment and the actual levying of it does not make the feared event uncertain or a current challenge to the authorization of it untimely.

(3).

■ The other issues, as we said, overlap and have to be viewed in a proper context. Although in some respects the second amended complaint was very narrowly drawn, focusing almost exclusively on the Resolution approving the extension and mentioning only casually or not at all pertinent sections of the County Charter and Code, it sought to make two basic points: (1) that the extension was not necessary for the protection of the public health, and (2) if it *was* necessary for that purpose, the County Council should have directed the county to pay for it. The court rejected the first argument, and properly so. There was an abundance of evidence in support of the County Council's finding that the extension was necessary to protect the public health. The questions, then, are whether the court erred in concluding that the County Council "did not consider [the] benefit accruing to the general public" and in striking the "legislative determination" to proceed in accordance with the formulated allocation of costs, and whether that latter issue should have been taken first to the county board of appeals. Those are the matters we shall now address.

(4)

It is presumed that public improvements—roads, sanitation facilities, and the like—provide a benefit to the public in general. Otherwise, they would not be undertaken by the municipality and might, indeed, be beyond the authority of the municipality to undertake. Such projects often, however, confer a special benefit on property more directly served by them, which has led municipalities to require that the specially benefited property owners contribute to the cost of the project through special benefit assessments.

Because in each such case there is necessarily some benefit to the public at large from the improvement, the question arises as to how much of the cost may properly be laid against the specially benefited property (or, conversely, how much of the cost must be borne by the public from general tax revenues). In this regard, the caselaw makes two things quite clear. To remain true to the underlying justification for special benefit assessments and to avoid an unconstitutional confiscation, (1) there must be some reasonable basis for concluding that the property subject to the special assessment will, indeed, be specially benefited by the improvement over and above the general benefit to the public, and (2) the amount of special assessment may not exceed a reasonable estimate of the special benefit conferred upon the property. *See M. & P.R. Co. v. Nice*, 185 Md. 429, 45 A.2d 109 (1945); *Schultze, supra.*

Those are bedrock conditions, and, to pass Constitutional muster, any scheme to finance public improvements through special benefit assessments must comply with them. But, as a general rule, it has not been regarded as necessary for the municipality either to measure precisely the actual special benefit conferred upon each piece of property subjected to a special benefit assessment or to calculate precisely how much of the improvement is for the general public and how much is for the special benefit of particular property. In the absence of substantial evidence to the contrary, the courts have tended to assume that the legislative body has acted in a proper manner and have therefore deferred to its determination. In *V.F.W. v. Montgomery County*, 207 Md. 442, 452, 115 A.2d 249 (1955), the Court stated that, "[w]here the legislature has fixed the assessment, the courts will ordinarily enforce it and the matter is usually considered one for the exercise of legislative discretion." The *Schultze* Court reiterated that principle: "A legislative determination as to the imposition of a special assessment upon property specially benefited is presumed correct. And an assessment, if imposed according to

a definite and just plan, will not be disturbed where neither fraud nor mistake appears." 302 Md. at 490, 489 A.2d 16.

Absent some compelling circumstance, this deference accorded to the legislative judgment applies not only with respect to the two basic conditions noted above—that the special assessment does not exceed in amount the special benefit actually conferred by the improvement—but also to the implicit determination that the proportion of the cost to be recovered through special assessments is fairly commensurate with the ratio that the total special benefit to that property bears to the general public benefit. Indeed, the Court of Appeals has not hesitated to sustain a legislative determination that the full cost of improvements be recovered from special benefit assessments. *See Dinneen v. Rider, supra,* 152 Md. 343, 136 A. 754, so sustaining the original Act in question here. *See also V.F.W. v. Montgomery County, supra,* 207 Md. 442, 115 A.2d 249, sustaining an ordinance allocating 80% of the cost of street improvements to abutting property owners in the face of evidence that the principal reason for the improvements was to provide access to a newly constructed public school.

*Schultze* does not change that principle. In *Schultze,* the county decided to widen an arterial road. One county ordinance required that the full cost of construction be assessed against abutting property; another ordinance provided that all costs in excess of the special benefit to the abutting property be borne by the county. Without any consideration whatever to whether the abutting properties would even be benefited by the widening of the road, much less as to how much of a benefit would be so conferred, the county council assessed the full cost against the abutting properties. *That* is what this Court and ultimately the Court of Appeals found wanting:

> "Thus, while it may be appropriate to utilize the front-foot method of assessing property *even where the improvement was not undertaken for the special benefit of the adjacent property owners,* the method must be fairly applied in light of the improvement's primary pur-

pose. In other words, where the project was undertaken, as here, to facilitate the public's transportation needs, and thus to benefit the public generally, the front-foot rule cannot be so mechanically ap[p]lied as to require the adjacent property owners *automatically to pay the total costs of construction without any relation to the special benefit actually conferred upon the property.*

The appraiser in this case concluded that the total costs equalled the total benefit to the property owners on a proportionate front-foot basis.... It is apparent that the appraiser did not take into account the provisions of the county ordinance requiring the property owners to pay only that portion of the total costs as actually reflect the special benefit conferred upon the property, i.e., the benefit over and above that to be absorbed by the County, if any, to compensate for the public benefit."

302 Md. at 491–92, 489 A.2d 16 (emphasis added).

▪ That is hardly the case here. In the first place, we are not dealing with a highway that may or may not benefit the abutting property. We are dealing here with failing septic systems that the owners themselves charge may constitute a public nuisance. Indeed, to the extent there is a general public benefit from the extension of the sewer line, it arises from the fact that the public drinking water will no longer be polluted by effluent escaping from these properties. The public benefit, in other words, stems directly from the special benefit conferred on these properties and is not either foreign or simply incidental to it.

▪ Second, unlike the situation in *Schultze,* the property owners here are not being charged the full cost of the project, but just over half of it. And, finally, although the 52%/48% allocation was derived by application of a formula, it was not something that was accepted blindly and unthinkingly. The evidence shows that the County Council was well aware of the need for the project, the effect of the improvement on both the properties to be assessed and the public health, and the amount each property would be

assessed. The record does not support the Circuit Court's conclusion that the Council "did not consider that benefit accruing to the general public by reason of the improvement" or that the procedures used, based on §§ 34–28 and 34–69 "were accomplished without the constitutional guarantees attendant to special assessments...." Upon this record, therefore, we believe that the court erred in drawing those conclusions and then acting upon them.

(5)

That leaves the question of whether the court should have entertained the action in the first place—whether the owners should have taken their complaint first to the county board of appeals. We have left that to last because it has to be considered in the light of the law governing the financing of these projects.

Md.Code Ann. art. 25A, § 5(U) permits the county to create a board of appeals and to empower it to decide, among many other things, "the assessment of any special benefit tax." Section 5(T) further authorizes the county to enact laws relating to "the disposal of wastes" and "providing appropriate administrative and judicial proceedings, remedies, and sanctions for the administration and enforcement of such ordinances...."

As we have observed, § 307 of the County Charter delegates to the chief sanitary engineer, under the supervision of the county administrative officer, "all duties and powers relating to ... the fixing of special assessments." It was, we presume, pursuant to that authority that those officials put into place the policy calling for the county to bear half the deficit charges arising from extension projects undertaken for health reasons. Section 602 of the Charter authorizes the board of appeals to hear and decide appeals from orders relating to zoning, licenses, building, and "appeals from all other administrative and adjudicatory orders as may from time to time be provided by Article 25A...."

It is certainly arguable that, by virtue of these provisions, the board of appeals might have jurisdiction to hear an appeal from an administrative order of the chief sanitary engineer determining the assessment of a special benefit tax arising from a sewer extension project. The Circuit Court never addressed that question. Rather, assuming the board's jurisdiction, it concluded that the owners fell within three of the "exceptions" to the requirement of exhaustion of administrative remedies recognized in *Prince George's Co. v. Blumberg,* 288 Md. 275, 418 A.2d 1155 (1980), *cert. denied* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981).

> In *Blumberg,* the Court confirmed the "legal tenet" that, "[A] claimant ordinarily must seek to redress the wrong of which he complains by using the statutory procedure the legislature has established for that kind of case, if it is adequate and available, and that if he is unsuccessful and wishes aid from the courts, he must take judicial appeals in the manner the legislature has specified rather than by seeking to invoke the ordinary general jurisdiction of the courts...."

288 Md. at 283–84, 418 A.2d 1155, quoting *Agrarian, Inc. v. Zoning Inspector,* 262 Md. 329, 332, 277 A.2d 591 (1971). It then observed that there were a number of exceptions to that rule, among them being

> "When there is a direct attack, constitutional or otherwise, upon the power or authority (including whether it was validly enacted) of the legislative body to pass the legislation from which relief is sought, as contrasted with a constitutional or other type issue that goes to the application of a general statute to a particular situation.
>
>      *     *     *     *     *     *
>
> Where the administrative agency cannot provide to any substantial degree a remedy.

> [and]

> When the object of, as well as the issues presented by, a judicial proceeding only tangentially or incidentally con-

cern matters which the administrative agency was legislatively created to solve, and do not, in any meaningful way, call for or involve applications of its expertise." 288 Md. at 284-85, 418 A.2d 1155 (citations omitted).

The court below found each of these "exceptions" to be applicable, and on that basis concluded that it had jurisdiction.

■ In light of the allegations in the second amended complaint, and, more important, in light of the relief requested by the owners, we do not believe that the board of appeals had any jurisdiction over this controversy in the first instance. But even if it did, we have no doubt that at least the latter two exceptions noted above would apply.

The owners were not attacking an administrative order of the director of public works, or indeed the order of any administrative official. They were attacking, and asking that the court declare illegal and void, the Resolution of the County Council approving the extension (Bill No. 20-84). *That*, under § 307 of the County Charter, is a legislative act committed exclusively to the legislative branch of the county government, and we see nothing in § 5(U) of art. 25A or in § 602 of the County Charter that would allow the board of appeals to reverse or modify that act.[4]

It may or may not be the case that some of the administrative decisions involved in proposing or implementing the extension would be subject to board jurisdiction. We need not consider here whether an appeal might lie to the board from the executive decision to have the county pay half—as opposed to some greater or lesser proportion—of a deficit, or from other executive policies calculating and implement-

---

**4.** Section 606 of the County Charter authorizes the County Council, by legislative act, "to prescribe other appeals to be heard by the county board of appeals," but we are aware of no such legislative act that would permit the board to entertain appeals from approvals of sewer or water line extensions by the County Council.

ing individual assessments.[5] Those policies and decisions were not directly being challenged here. What was challenged was the Council's approval of the extension in light of those policies and decisions, and that, as we have said, is a matter over which the board has no authority.

We therefore conclude that the court had jurisdiction to entertain the action, but, as noted, it erred in the manner it exercised that jurisdiction.

JUDGMENT REVERSED; APPELLEES/CROSS–APPELLANTS TO PAY THE COSTS.

---

**5.** In August, 1985, the County Council enacted Bill No. 124–85, which requires the county to give advance notice to affected property owners of proposed special benefit assessments arising from the extension of a water or sewer main and, upon timely protest, to provide a hearing on the protest before the office of finance. We are advised that the owners in this case will have the benefit of such hearings.