670 A.2d 968

## WOODMONT COUNTRY CLUB

v.

## MAYOR AND CITY COUNCIL OF ROCKVILLE.

No. 1186, Sept. Term, 1994.

Court of Special Appeals of Maryland.

Jan. 31, 1996.

700

Stephens J. Orens (Wendy D. Pullano and Conroy, Ballman & Dameron, Chtd., on the brief), Gaithersburg, for appellant.

Sondra Harans Block, Assistant City Attorney (Paul T. Glasgow, City Attorney, on the brief), Rockville, for appellee.

Argued before MURPHY and HOLLANDER, JJ., and JOHN W. SAUSE, Jr., Judge, Specially Assigned.

SAUSE, Judge.

On October 4, 1993, Woodmont Country Club (Woodmont) filed petitions in the Circuit Court for Montgomery County requesting judicial review "pursuant to Maryland Rules 7–201 *et seq.*" and Article XI(d) of the Charter of Rockville of certain special assessments made by the City of Rockville (the City) in connection with the construction of Wootton Parkway [1] and an appurtenant water transmission system.[2] After hearing, the

---

1. The project was actually an extension of an existing road known as "Ritchie Parkway", but the area in question came to be known as "Wootton Parkway."

2. Each assessment was the subject of a separate ordinance, which prompted the filing of separate petitions by Woodmont. The cases were consolidated for hearing in the Circuit Court.

Court entered a memorandum and order by which "the appeals ... are hereby dismissed."[3] This appeal is from that order.

## The facts

On May 14, 1990, the City adopted an ordinance (# 12–90) whose primary effect was to establish a June 4, 1990, hearing in connection with proposals for "extension of Ritchie Parkway between Seven Locks Road and Rockville Pike" and "that the abutting properties specially benefited by said improvements be assessed according to the front foot rule of apportionment or some other equitable basis." A companion ordinance (# 13–90) established a concurrent hearing in connection with "construction of a water transmission main, fire hydrants, valves and related work and appurtenances" within the new roadway, again with a proposal that a portion of the cost be paid by way of special assessment upon abutting landowners.

The proposed route of Wootton Parkway lay largely through property owned by appellant Woodmont.[4] Three weeks after the hearing on June 4, 1990, Woodmont conveyed to the City a total of 20.3 acres.[5] The purchase price, arrived at after negotiations which seem to have been ongoing for some time, was $6,400,000, together with a number of other

---

3. Although couched as a dismissal, its effect was actually to deny a request by the City for a dismissal and to affirm the City's action in adopting the ordinances. *Compare,* Rule 7–209.

4. The new road also affected an area known as Tower Oaks (referred to as "a mixed-use site") and several properties which fronted on Rockville Pike and were owned by D.F. Antonelli, Wintergreen Plaza Shopping Center and Congressional Oldsmobile. Ultimately, it was determined that the only properties "specially benefitted" were those of Woodmont, Antonelli and Tower Oaks. Antonelli and Tower Oaks entered into agreements acknowledging special benefit and establishing the amounts to be assessed. Only Woodmont is involved in this appeal.

5. 15.83 acres was necessary for the road. The additional 4.47 acres represented land which construction of the road would sever from the main tract owned by Woodmont.

undertakings by the City.[6] Woodmont "waive[d], quit-claim[ed] and surrender[ed] any and all rights . . . against the City for severance or other damages to the remainder of . . . [the Club's] property."

A second set of ordinances, authorizing construction of the road (# 18–90) and the water main (# 19–90), were adopted on July 9, 1990. Both ordinances directed the City Manager "to cause appraisals of the properties specially benefitted by the proposed public improvements to be made prior to the commencement of the construction of the improvements . . . and, in addition, to cause appraisals to be made upon completion of the improvements."

Upon completion of the projects—the road and water main were completed, for costs said to be $24,060,725 and $946,-952.79, respectively—public hearings were held on May 17 and June 21, 1993, with respect to the assessments to be levied in accordance with the ordinances of July 9, 1990. By a third set of ordinances, adopted on September 27, 1993, the Mayor and Council "accepted and approved" the road and water main and "found and declared" that they were "of special benefit to . . . properties shown on . . . [an attached] list in the amounts assessed on said list", such amounts being, as to Woodmont, $2,943,000, as a result of the road (# 13–93), and $61,319.38, resulting from construction of the water main (# 14–93).[7] If paid with interest over a period of 20 years, as allowed by the ordinances, the Club's total obligations would be $5,212,297.27 and $108,601.71, respectively.

---

**6.** These included screening, fencing, protecting "the existing water source presently feeding the Seller's pond", "[p]rotection of the existing water service line" during construction and replacement of the latter "with an improved service line" from a new main to be constructed in Wootton Parkway.

**7.** The ordinances included assessments against the properties of Antonelli ($100,000, as to the road, and $18,750.06, as to the water main) and Tower Oaks ($3,057,816.69 road benefit and $74,226.93 for the main), as to both of which agreement had previously been reached. *See* footnote 4, *supra.*

### The parties' contentions

The Circuit Court synthesized the parties' contentions into 5 issues:

1. Has the Club waived its right to complain about the special assessments because it made the first of 20 annual payments?

2. In determining the special benefit to the Club property, was the City correct in appraising the property at its highest and best use?

3. Was the Club afforded due process in connection with the levy of special assessments against its property?

4. Has the Club met its burden of overcoming the presumption of validity attached to the City's actions in determining a special benefit?

5. Was the special assessment for the construction of a water transmission main valid?

The Court directly addressed only the first two issues. The City's claim that payment of a portion of the special assessment precluded Woodmont's right to make any objection to the entire assessment process was found to be only "partially correct." [8] After extended discussion of the second question, it was squarely held that "it was proper for the City to base its valuation of the special benefit on the properties' 'highest and best' use." The remaining matters were given shorter shrift: "Questions 3, 4 and 5 can be disposed of in short order . . . [because] for the reasons set forth in the City's brief, the Club's contentions with respect to these questions are without merit."

For reasons hereafter stated, we agree with the lower court's conclusion that this appeal is not precluded by Woodmont's having paid installments of the assessments due under

---

8. The trial judge said, "The simple fact of the matter is that they [the remaining 19 installments] have not been paid. Thus, there is no question of a refund, there is simply a question of whether or not they should be paid. This question is properly before this Court."

the ordinances [9] and affirm its decision with respect to the second. In our view of the case, however, Woodmont's contention of denial of due process and the allied issue concerning the absence of any presumption to be accorded the City's action under that circumstance (the third and fourth questions framed, although not directly addressed below) have controlling merit and require reversal of the action of the Circuit Court. As this will involve further hearings and findings impossible to anticipate, we do not reach other, somewhat hyperbolic arguments here advanced by Woodmont—principally, the supposed applicability of the Supreme Court's recent decision in *Dolan v. City of Tigard,* 512 U.S. ——, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).

### Partial payment as affecting judicial review

The City argued below that, as stated by the Circuit Court, "the Club's payment of a portion of the special assessments precluded it from challenging the assessments." As noted, the Court ruled that "the City's argument in this regard is partially correct", in that Woodmont was not entitled to a refund of amounts already paid, but "The simple fact of the matter is that . . . [the remaining installments] have not been paid", and "there is simply a question of whether or not they should be paid." The City here narrows the scope of its original argument: "The Club is barred from recovering that portion of the special assessments it paid prior to taking this appeal"—a clear adoption of the finding below and recognition of the propriety of at least some judicial review.[10]

While we agree that judicial review is proper in this case, we should not be understood as endorsing the reasoning of the lower court. The case relied upon by it and the City is *Wash. Sub. Sanitary Comm'n v. C.I. Mitchell & Best Co.,* 303 Md. 544, 495 A.2d 30 (1985), where the Court stated "the Maryland

---

**9.** Although we do not reach its corollary, that Woodmont may not recover any payments already made.

**10.** This statement also seems to suggest that recovery is precluded only as to "assessments . . . paid prior to taking this appeal."

common law rule under which voluntary payments, made under a mistake of law, of taxes or other public charges are not recoverable" by quoting (at 572, 495 A.2d 30) from *Apostol v. Anne Arundel County*, 288 Md. 667, 672, 421 A.2d 582 (1980):

It is firmly established in this State that once a taxpayer voluntarily pays a tax or other governmental charge, under a mistake of law or under what he regards as an illegal imposition, no common law action lies for the recovery of the tax absent a special statutory provision sanctioning a refund. This is true even if payment is made under protest. Moreover, in these circumstances, no common law or declaratory judgment action lies to challenge the validity of a tax so paid. Where there is a special statutory provision sanctioning a refund, although no particular statutory remedy is provided, an action in assumpsit is available. However, where there is statutory authorization for a refund and a special statutory remedy set forth, that remedy is exclusive.

As made clear elsewhere in the *Mitchell & Best* opinion, the rule is not without exception, albeit such is extremely limited and involves factual determination of whether the payment was made under compulsion.[11] We need not explore the matter here. The rule involved is one which involves the existence of a cause of action for recovery of money which has been paid. This is a proceeding for judicial review of the action taken at the hearings in May and June 1993. Neither the Circuit Court (Rule 7–209) nor this Court (Rule 8–604) has any authority to direct repayment in this proceeding, and we have not been asked to do so. Matters relating to repayment

---

11. *Cf.* Rule 7–205, pertaining to stays pending judicial review. *Compare, Franzen v. Dubinok*, 290 Md. 65, 71, 427 A.2d 1002 (1981), where it was held that "The essence of a final judgment as an order of the court, the automatic creation of a lien on property which cannot be removed while maintaining an appeal but by satisfaction of the award, and the fact that it is subject to execution, all combine to support the conclusion that the payment of a judgment unless tendered as a compromise or a settlement or under an agreement not to appeal may normally quite properly be viewed as involuntary, creating no bar to appellate review."

will await determination in such proper proceeding as may hereafter be instituted for that purpose.

### Presumption of correctness

 Here, the City first asks that we spare ourselves the exercise of undertaking more than superficial examination of its action, since it claims that "the method by which a governmental entity assesses and apportions the cost for a public improvement is a legislative question subject only to constitutional limitations, and the exercise of such legislative discretion will not be reviewed by courts when there appears to be neither fraud nor mistake", citing, *inter alia, Williams v. Anne Arundel County,* 334 Md. 109, 123, 638 A.2d 74 (1994) where it is said that:

> The legislative judgment in levying benefit assessments ... is entitled to the highest deference. 'In the absence of a showing of arbitrary action and plain abuse of power,' the legislative body's decision is final.... 'And an assessment, if imposed according to a definite and just plan, will not be disturbed where neither fraud nor mistake appears' ... [citations omitted].[12]

Numerous other cases (including virtually all of those hereafter cited) are to the same effect. There is even a more specific "general rule that the law presumes that street paving, which facilitates travel and affords better access to abutting property, confers a special benefit upon the abutting property owner as well as a general benefit upon the community." *Maryland & Pa.R.R. v. Nice,* 185 Md. 429, 433, 45 A.2d 109 (1945), and *Silver Spring Memorial Post No. 2562, V.F.W. v. Montgomery County,* 207 Md. 442, 452, 115 A.2d 249 (1955).

---

**12.** In the same vein, but more specifically, the City urges that "a finding by a legislative body that special benefit exists is presumed to be correct and constitutional, 'even if the legislative body acted without any evidence at all.' *Murphy v. Montgomery County,* 267 Md. 224, 237 [297 A.2d 249] ... (1972) quoting from *Crown Central Petro. Corp. v. Mayor and City Council of Baltimore,* 258 Md. 82, 88, [265 A.2d 192] ... (1970)."

These rules plainly presuppose at least facial regularity of the proceedings in which the action was taken—at the very least, "absence of a showing of arbitrary action and plain abuse of power." It would be a strange doctrine indeed which would attach a presumption of correctness to a determination of any kind which was reached through an improper process. The rule mus*:* be, and is, as quite simply stated in *Town of Somerset v. Montgomery County Bd. of Appeals*, 245 Md. 52, 67, 225 A.2d 294 (1966), that where a procedural right has been properly asserted, "its denial vitiated the proceedings."

■ Plainly, any presumption of regularity must give way if, in fact, a procedural right of due process has been denied. It is undisputed in this appeal that Woodmont was categorically denied the right to cross-examine the experts whose testimony formed the sole basis for the action taken by the City.[13] Whether that right is one required by procedural due process, as vigorously urged by Woodmont and denied by the lower court and the City, presents a justiciable issue of the highest order.

### The hearing requirement

■ The City next seeks to avoid Woodmont's due process claims on the theory that "the hearings held in May and June 1993 were purely gratuitous" and thus no more was required than what the Council chose to allow. The predicate is that "The only hearings required by the City Charter were the 1990 hearings preceding the legislative determination to au-

---

13. At the hearing of June 21, 1993, counsel for Woodmont indicated that "I understand from Mr. Glasgow [the City Attorney] and from the City Manager's Office that cross-examination is not considered appropriate by the Mayor and Council in these proceedings, and while I respectfully disagree with that and do press that—and I think, as you will see from the testimony, there are some substantial differences that might have been explained by cross-examination—I am not going to waste your time and everybody else's time arguing the point with you tonight. Suffice it to say that I appear here still making that request, and I understand that my request had been denied." The record also contains correspondence indicating that the request had in fact been made, and denied, well before the hearings began.

thorize construction of the two public improvements as special assessment projects."

It is difficult to imagine that the City has fully explored the ramifications of this proposition, since to do so would in our opinion call into serious question the ability of the City to make any assessment at all in 1993.

Article XI of the Charter of the City of Rockville ("Special Assessments") contains a single section, divided into paragraphs (a) through (h). Subsection (a) authorizes the Council "to grade, construct, reconstruct, pave, provide street lighting, landscaping, or other amenities, for ... any street ... public highway, or any public right-of-way or property ... to such extent and of such materials and in such manner as shall be provided by ordinance and to purchase, contract to purchase, lay or contract to lay water mains and truck and lateral sewers...."

In order to "pay the costs of all such work", it is also empowered to:

> ... assess said cost, or any part thereof, against the abutting property and any other properties benefited thereby *as hereinafter provided in this section* [emphasis supplied].[14]

Subsection (c) contains express procedures, and an express timetable to be followed by the Council:

> *Before entering upon the construction of any work or improvement specified herein,* the Council shall by ordinance designate [1] the location, extent and kind of work or improvement proposed to be done or made, [2] the kind of materials to be used, [3] the estimated cost of the improve-

---

14. Subsection (b) authorizes the Council to take similar action, "in all respects in the manner and in the form hereinafter provided in this section" on petition of 20% of property owners to be benefited. Similar provision is made in subsection (f), which also permits waiver of the other requirements of the section by "all the abutting property affected." These provisions have no application, as it is clear that the construction involved originated with the City; and, in any event, no waiver of any kind appears in the record.

ment and [4] the real property which will be benefited thereby and which it is proposed to assess to pay all or any part of the cost thereof ... [emphasis supplied].

The same paragraph requires the Council to "fix a time and place when and where the owner or owners of the property to be so assessed therefor can be heard in reference thereto", in connection with which the Council is to "serve" by mail written notice upon such property owners and to publish notice twice in a newspaper of general circulation in the City.

Subsection (d) provides that:

If after the hearing the Council shall be of the opinion that the public health, safety, welfare, comfort, or convenience requires the work or improvement proposed to be done or made, it shall provide by ordinance for the same and may charge the expense thereof or any part of such expense against the property which it shall find to be specially benefited thereby according to the front foot rule of apportionment or some other equitable basis as may be determined by it....[15]

[¶] The Council shall also provide in said ordinance the time and terms upon which payment of said assessments for said work and improvements shall be made by said property owners, the rate of interest, if any, that shall be charged upon deferred payments and shall provide penalties for failure to pay any deferred payment when due. The ordinance may temporarily exempt certain properties from the assessment, in whole or in part, until a date certain and/or the occasion of a specific event or change in circumstance, provided that such exemption is made pursuant to legislation duly adopted by the Council which shall provide for, among other things, certain criteria and/or standards for properties entitled to an exemption.

The same subsection (d) provides that "An assessment *made pursuant to this Article* shall be a lien upon the

---

15. The omitted portion relates to permissive inclusion of certain "miscellaneous expenses" as part of the cost of construction.

property against which it is charged superior to all other liens from the date of the approval of such assessment by the Council [emphasis supplied]." The subsection concludes with the establishment of an "appeal ... to the Circuit Court for Montgomery County ... according to the Maryland Rules set forth in Title 7" and "[a]ppeals of the decision or judgment of the Circuit Court ... to the Court ofd [sic] Special Appeals and Court of Appeals as prescribed by the Maryland Rules."

From the above review, it is manifest that the Charter makes detailed and specific requirements for the establishment of special assessments for public improvements of the type here involved.[16] Although all of those requirements are to be fulfilled "Before entering upon the construction of any work or improvement", the City did not follow that timetable.

The initial set of 1990 ordinances, those of May 14, represented no more than formal expression of intention to consider the improvements and establishment of the hearings required by the Charter. They also contained, as to each of the projects, "Total estimated project cost",[17] and "Estimated assessable costs." [18]

---

**16.** Other subsections of Article XI are not applicable to the present facts. In addition to subsection (f), noted in footnote 14, subsection (e) makes provision for collection of overdue assessments "[i]n the event that provision shall be made for the payment of the *assessment aforesaid* in installments" [emphasis supplied]; subsection (g) authorizes the Council to borrow funds necessary for improvements, such loans to be repaid from "special assessments *levied under the provisions of this section*" and "ad valorem taxes ... upon all property within the present or future corporate limits of the City ... without any limitation as to rate or amount [emphasis supplied]"; and subsection (h) authorizes reconstruction and repair of "any public improvement" and empowers the Council to "adopt legislation establishing the procedures whereby periodic, continuing and on-going repairs and maintenance of a public improvement may be specially assessed."

**17.** $35,131,811, as to the road and $1,283,281 as to the water main.

**18.** $14,210,795 for "construction" and $17,671,016 as to "rights-of-way" in connection with the road and $363,299 as to the water main.

The preambles of the second set of ordinances (# 18–90 and # 19–90, adopted July 9, 1990),[19] adopted after the first hearing, contain more substance in their recitation that in conformity with Article XI of the Charter, (1) the Council had in the May ordinance (# 12–90) established "the location, extent and kind of work or improvements proposed to be done, the kind of materials to be used, the estimated cost of the improvements, the real property which will be specially benefited thereby, and which is proposed to be assessed, and fixed a time and place when and where the owners thereof could be heard in reference thereto"; (2) notice had been given by mail and publication, as required by subsection (c); (3) the hearing had been held; and (4) the first requirement of subsection (d) by the Council's determination that "the work or improvements ... is required for the public health, safety or comfort of the City of Rockville" had been fulfilled.

The first section of this second set of ordinances formally "ordained" that "the public improvements ... are ... authorized to be done and constructed." A second, and last, section directed the City Manager "to cause appraisals of the properties specially benefited by the proposed public improvement to be made prior to the commencement of the construction of the improvements ... and, in addition, to cause appraisals to be made upon completion of the improvements."

What both preambles and operative provisions of the 1990 ordinances did *not* do[20] was to embody what was permissive under subsection (d): assessment "against the property *which it shall find to be specially benefited* thereby according to the front foot rule of apportionment or some other equitable basis." The ordinances thus state the matter of assessment in the future tense and contain absolutely no current findings with regard to "property ... specially benefited." As a result,

---

**19.** The first involved construction of the road and the second the water facilities. As both carry almost identical language and differ only in subject, only that relating to the road is quoted here.

**20.** Or purport to do, other than by reference to a *pre*-hearing suggestion of "the real property which will be specially benefited ... and which is proposed to be assessed" and notice to the owners of such property.

they did not address the specific direction as to what "the Council *shall* also provide in said ordinance" in the event that assessment was made, namely, "the time and terms upon which payment of said assessments for said work and improvements shall be made by said property owners, the rate of interest, if any, that shall be charged upon deferred payments and ... penalties for failure to pay any deferred payment when due."

The fact of the matter is that all of the requirements of Article XI of the Charter were not addressed, much less resolved in 1990. We are offered, and have found, no other authority for the assessments here considered. As a result, if we are to follow the invitation of the City to find that only those proceedings were required, we should be forced to conclude that the City had no authority thereafter to make an assessment. By the express language of Article XI, all proceedings which it authorized were to be taken "Before entering upon the construction of any work or improvement." [21]

The City's suggestion is even at odds with its own conduct in this proceeding. The penultimate and final sentences of subsection (d) of Article XI of the Charter provide for an "appeal" by "Any person aggrieved by the levy of a special assessment *in accordance with the provisions of this Article.*" As recognized by the Circuit Court, this is the only provision which authorizes judicial review of any action taken by the City with respect to a special assessment. Again, we have found no other. If the view of the City were correct, and the only relevant proceedings were those in 1990, Woodmont's 1993 application for judicial review would have been untimely (Rule 7–203) and the proper course for the City would have been to seek dismissal, yet that is not even suggested.

---

**21.** *Cf. West Mont. Ass'n v. MNCP & P Com'n,* 309 Md. 183, 198, 522 A.2d 1328 (1987): "this chartered county is precluded, by the express and unequivocal language of the statute that granted it zoning power, from exercising that power in any manner other than that specifically authorized."

Manifestly, although such seems to be at odds with a strict interpretation of the language of the Charter requiring all action to be taken "Before entering upon the construction of any work or improvement", what the Council intended to do—and what it actually did—was postpone matters relating to actual assessment, even including the final designation of those to be assessed, until after the work was completed. As flatly recognized in the ordinances adopted in 1993 which are here involved, the 1990 ordinances had only "*proposed* that the costs of said construction be assessed against the properties specially benefited thereby", but without the slightest inference that the question had been addressed at the 1990 hearing even to that limited extent, much less that any firm determination had been made that such "special benefit" actually existed.

The wisdom of that course was borne out by subsequent events. As ultimately reflected in the 1993 ordinances, the total project cost for the road was $24,060,725—some $11,071,086 less than projected in 1990—and $946,952 for the water main—$336,329 less than the original estimate.[22] The final tabulation was, if anything, more dramatic with regard to assessment. Assessment was ultimately made against only 3 of the 5 property owners identified in 1990. In terms of dollars, the total assessment for the road was to be $6,100,816 (less than 20% of the $31,131,811 estimated in 1990) and $154,295 for the water main (instead of the estimated $363,299).[23]

It is more than plain to us that the 1993 ordinances and the hearings upon which they were based were the culmination of the process authorized by Article XI of the Charter and an indispensable part of any special assessment. To say otherwise would render meaningless the opportunity for hearing afforded persons proposed to be assessed, both because the persons to be assessed and the amounts of the assessment

---

22. See footnote 17.

23. See footnote 18.

were at best tentative and at worst inaccurate, and still more because the predicates for actual assessment (*i.e.* the amounts by which specific properties derived special benefit) were not addressed at all until 1993.

We cannot by any stretch of the imagination adopt the City's view that the 1993 hearings were unnecessary. If Woodmont was entitled to notice and hearing, as it plainly is under Article XI of the Charter, it certainly was not afforded such in the 1990 proceedings. More to the point, and disastrous from the City's standpoint, if the 1990 proceedings are to be viewed as fulfillment of the Charter requirements, the process was at an end without the City having made any assessment at all. As a result, a proper characterization of the 1993 hearings would not be "gratuitous", but "illegal", with the inescapable characterization of the assessments based upon them being "void."

For its part, Woodmont has made no suggestion that the 1993 proceedings themselves were unauthorized, and in the absence of such we adopt, at least for purposes of this case, the view that all parties, recognizing the common sense proposition that a final determination of assessment could not be accurately made until the project was completed, viewed the provision requiring all action to be taken prior to commencement of the project as merely directory and bifurcated the required proceedings.

We therefore reject the City's notion that the 1993 hearings were not part and parcel of what was required of the Council under Article XI of its Charter and turn to the matter of Woodmont's right to cross-examination at those hearings.

## The right of cross-examination

We turn at last to the true substance of this appeal. The City's ultimate contention is that, even if the hearings themselves were required, cross-examination was not, because the Council was engaged in what it regards as "the uniquely legislative determination as to the appropriate apportionment

of the funding of a public improvement between the public treasury and benefitting property owners."

The seminal case of *Hyson v. Montgomery County Council,* 242 Md. 55, 217 A.2d 578 (1966), involved rezoning of a parcel of land by a county council and failure to allow cross-examination of witnesses. As here, it was argued that the council was acting in a legislative, or quasi-legislative,.capacity in which cross-examination was not required as a matter of right.

The Court recognized the constitutional distinction between executive, legislative and judicial functions, but also noted within the latter two a further division: "functions, when they are not purely and completely judicial or legislative in nature, but have qualities or incidents resembling them, are referred to as quasi-judicial or quasi-legislative" (242 Md. at 61, 217 A.2d 578). In that regard, "the *actual acts* of zoning and rezoning are legislative or quasi-legislative in nature [emphasis supplied]", but those "actual acts" are distinguishable from the procedures upon which they are based (at 62, 217 A.2d 578):

> Up to the present time, no one has been able to delineate, with precision and accuracy, an exact formula for determining the line of demarcation between the differences between legislative and judicial functions. These differences, on occasions, are particularly difficult of determination when mixed, blended, or combined functions are given, and exercised by, the same official, board, or agency ... which is frequently the case.... And when the same official, board, or agency performs, in one proceedings, quasi-judicial and quasi-legislative functions, it is misleading and inaccurate to characterize the whole proceedings as judicial or legislative in nature [citations omitted].

In cases where a body.is required "to resolve disputed questions of adjudicative facts (as contradistinguished from legislative facts or judicial action) [24] concerning particular par-

---

**24.** "... adjudicative facts are 'roughly' the kind of facts that go to a jury in a jury case". 242 Md. at 64, 217 A.2d 578, quoting Davis, *Administrative Law Treatise,* § 7.02.

ties ... it necessarily was performing a quasi-judicial function, even though its final action, in granting or denying the reclassification which was required to be based upon its findings of adjudicative facts, was quasi-legislative in character" (242 Md. at 64–65, 217 A.2d 578).

After review of a host of Maryland precedent, the Court had "no hesitancy in holding that the statutes and regulations [involved in that case] ... conferred quasi-judicial functions upon the Council in making its determination of facts at the hearing." On the matter of the right of cross-examination under that situation, it was squarely held that "The authorities seem to be in accord that when an administrative board or agency is required to hold a public hearing and to decide disputed adjudicative facts based upon evidence produced and a record made, that a reasonable right of cross-examination must be allowed the parties" (242 Md. at 67, 217 A.2d 578).

This Court recognized in *Tron v. Prince George's County,* 69 Md.App. 256, 268, 517 A.2d 113 (1986), that under these circumstances, cross-examination involves "a right, recognized and enforced in all courts wherein truth and justice is the objective, for the parties to the cause to be confronted with the witnesses against them, and an opportunity to test the correctness or truthfulness of the evidence by cross-examination."

The rule has been recognized and applied in, among other cases, *Schultz v. Pritts,* 291 Md. 1, 7–8, 432 A.2d 1319 (1981); *Dickinson–Tidewater v. Supervisor,* 273 Md. 245, 254, 329 A.2d 18 (1974); *Rogers v. Radio Shack,* 271 Md. 126, 129, 314 A.2d 113 (1974); *Birckhead v. Board of Co. Comm'rs,* 260 Md. 594, 600, 273 A.2d 133 (1971); *Springloch Citizens Gp. v. Montgomery County Bd. of Appeals,* 252 Md. 717, 725, 251 A.2d 357 (1969); *Gibson v. Talbot County,* 250 Md. 292, 298–299, 242 A.2d 137 (1968); *Bryniarski v. Montgomery Co.,* 247 Md. 137, 148–150, 230 A.2d 289 (1967); *Bayer v. Siskind,* 247 Md. 116, 123–124, 230 A.2d 316 (1967); *Town of Somerset v. Montgomery County Bd. of Appeals,* 245 Md. 52, 65–67, 225 A.2d 294 (1966); *Tron v. Prince George's County, supra,* 69

Md.App. 256, 261, 517 A.2d 113 (1986); *Md.–Nat'l Cap. P. & P. v. Friendship Heights*, 57 Md.App. 69, 82, 468 A.2d 1353 (1984); *Potomac Valley League v. County Council for Montgomery County*, 43 Md.App. 56, 61, 403 A.2d 388 (1979); *American Radio–Tel. Serv. v. P.S.C.*, 33 Md.App. 423, 435, 365 A.2d 314 (1976).[25]

To "further support" its position that the rule should not be applied in this case, the City conjures up a host of evils said to flow from the allowance of cross-examination.[26] Whatever else may be said, those fears are entirely imaginary, as it has been recognized, in and since *Hyson*, that cross examination may be reasonably restricted. *Springloch Citizens Gp. v. Mont. Co.*, *supra*, 252 Md. at 725, 251 A.2d 357; *Gibson v. Talbot County*, *supra*, 250 Md. at 298–299, 242 A.2d 137; *Tron v. Prince George's County*, *supra*, 69 Md.App. at 266, 517 A.2d 113.[27] But, nothing in the cases suggests that it may be completely denied.

**25.** *See also, Temmink v. Bd. of Zoning Appeals*, 205 Md. 489, 497, 109 A.2d 85 (1954), decided before *Hyson*, in which an agency had considered a report submitted after a hearing, and the matter was remanded with an order that "the parties may produce any further evidence and have the right of cross-examination."

**26.** "If cross-examination were required in special assessment hearings, each property owner would have the right to contest through cross-examination, not only the appraisals pertaining to its own property, but also the appraisals pertaining to each of the other properties. This logistical nightmare of potentially 20 or more property owners clamoring to cross-examine all of the City's appraisers as well as all appraisers retained by each property owner, only serves to further support what the law has already clearly established: that the adoption of an ordinance levying special assessments is a legislative act, for which no hearing and no cross-examination is constitutionally required."

**27.** "We have no intention of attempting to promulgate a comprehensive rule respecting the type or the amount of cross-examination that the Council must provide at hearings on applications for reclassification. The rationale of the cases and authorities is that reasonable cross-examination, which is required for a full and true disclosure of the facts, having due regard to the circumstances of each particular case, the nature of the proceedings, and the character of the rights which may be affected by it must be permitted; and that is as far as we are required to go at this time." *Tron v. Prince George's County, supra,* 69 Md.App. at 268, 517 A.2d 113.

■■ We do note that an important qualification to the rule is that, as stated in *Hyson*, the right must be asserted in timely fashion. *Schultz v. Pritts, supra,* 291 Md. at 7–8, 432 A.2d 1319; *Bayer v. Siskind, supra,* 247 Md. at 123–124, 230 A.2d 316; *Gibson v. Talbot County, supra,* 250 Md. at 299, 242 A.2d 137; *Bryniarski v. Montgomery Co., supra,* 247 Md. at 148, 230 A.2d 289; *American Radio–Tel. Serv. v. P.S.C., supra,* 33 Md.App. at 435, 365 A.2d 314. However, it is abundantly clear that such request was made in this case;[28] and the City does not contend otherwise.

### The character of the 1993 hearings

The City's position is that *Hyson* and its progeny have no application, for the reason that the 1993 hearings regarding special assessment involved a "uniquely legislative determination as to the appropriate apportionment of the funding of a public improvement between the public treasury and benefitting property owners." Primary reliance is placed upon *Mont. Co. v. Woodward & Lothrop,* 280 Md. 686, 376 A.2d 483 (1977), *cert. den.* 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978), which the City reads as holding that "No right of cross-examination exists at *legislative* hearings, and it is not a prerequisite to legislative findings, even when the 'decision may dramatically affect an individual.' "

Importantly, in that case, which involved consideration of a sectional zoning plan, the Court held (280 Md. at 712, 376 A.2d 483):

> That the effect of a zoning authority's decision may dramatically affect an individual is not determinative of the difference between adjudicative and legislative facts; rather, *it is the nature of the decision's fact-finding process, not the ultimate effect of the decision,* that determines the party's right to an adjudicatory hearing. [Emphasis supplied]

---

28. See footnote 13.

The Court found that "A real distinction exists between piece-meal [as in *Hyson* ] and comprehensive rezoning hearings; it lies in the nature of the basic function being performed by the zoning authority in each case" and concluded that, in the latter "comprehensive" type (280 Md. at 712–714, 376 A.2d 483):

> The procedure is fundamentally legislative and no significant quasi-judicial function is involved. That the Council determined the zoning for each specific property owned by the various appellees and considered the impact of traffic and environmental constraints upon the scale of permissible development within the CBD does not alter the basic fact that the issues for determination were legislative, not adjudicative, and did not require a judicial or trial-type hearing.

A similar distinction has been recognized in other contexts. *Union Investors v. Montgomery County*, 244 Md. 585, 588–589, 224 A.2d 453 (1966), proceedings for the sale of surplus public property are legislative; *Albert v. Pub. Serv. Commission*, 209 Md. 27, 120 A.2d 346 (1956), no hearing required in proceedings involving issuance of taxicab permits, although the requirement does exist in proceedings for the suspension or revocation of a permit.

In essence, the relevant inquiry here is thus the same as that in *Hyson:* "we must determine what is the type of public hearing which the Council was required to afford, and the nature of the functions exercised by the Council at such hearing, before the formal and final act of reclassifying the property or the denial of the application" and, if "the Council was considering and determining these adjudicative facts concerning particular parties, it necessarily was performing a quasi-judicial function, even though its final action, in granting or denying the reclassification which was required to be based upon its findings of adjudicative facts, was quasi-legislative in character" (242 Md. at 64–65, 217 A.2d 578).

■■■■■■ Great assistance lies in the recognized distinction between property taxes and special assessments. As recently noted by the Court of Appeals in *Williams v. Anne Arundel*

*County,* 334 Md. 109, 118, 638 A.2d 74 (1994), quoting *Gould v. Baltimore,* 59 Md. 378, 380 (1883):

> The right to make ... [special] assessments is undoubtedly an exercise of the taxing power, but an assessment thus made differs from a general tax levied for State and city purposes. The latter is a tax imposed on all persons within the territorial limits according to the value of their property, in consideration of the protection, which the government affords alike to all. A local assessment, on the other hand, is a tax levied occasionally as may be required upon a limited class of persons interested in local improvement, and who are presumed to be benefited by the improvement over and above the ordinary benefit which the community in general derive from the expenditure of the money. In the payment of the assessment thus made, the adjacent owner is supposed to be compensated by the enhanced value of his property, arising from the improvement.

As stated by this Court, in *Baltimore County v. Batza,* 67 Md.App. 282, 303, 507 A.2d 216 (1986):

> Because in each such case [involving special assessments] there is necessarily some benefit to the public at large from the improvement, the question arises as to how much of the cost may properly be laid against the specially benefited property (or, conversely, how much of the cost must be borne by the public from general tax revenues). In this regard, the case law makes two things quite clear. To remain true to the underlying justification for special benefit assessments and to avoid an unconstitutional confiscation, (1) there must be some reasonable basis for concluding that the property subject to the special assessment will, indeed, be specially benefited by the improvement over and above the general benefit to the public, and (2) the amount of special assessment may not exceed a reasonable estimate of the special benefit conferred upon the property.

A third determination to be made is "that the proportion of the cost to be recovered through special assessments is fairly commensurate with the ratio that the total special benefit to

that property bears to the general public benefit" (67 Md.App. at 304, 507 A.2d 216).

The determinations made at the 1993 Woodmont hearings concerned no public aspects, such as whether the already-completed projects represented legitimate public purposes or whether abutting property owners should be required to contribute to their cost. The inquiry, specific to each piece of private property sought to be assessed, was twofold. In the first instance, there must be "special benefit to the properties to be assessed *over and above that accruing to the public* [emphasis supplied]." *Tyler v. Baltimore County*, 251 Md. 420, 426, 247 A.2d 704 (1968); *V.F.W. v. Montgomery County, supra*, 207 Md. at 448, 115 A.2d 249. As recognized in *Maryland & Pa. R.R. v. Nice, supra*, 185 Md. at 433, 45 A.2d 109, "If the Legislature, or municipal officials acting as agents of the State, could impose upon certain private property the cost of a public improvement regardless of any special benefit accruing to the owner from such improvement, the guaranties for the protection of private property would be seriously impaired." Thus, if no special benefit exists as to that specific property, no special assessment may be made. *Leonardo v. County Comm.*, 214 Md. 287, 309, 134 A.2d 284 (1957); *United R. & E. Co. v. M. & C.C. of Balto.*, 127 Md. 660, 96 A. 880; *Baltimore v. Scharf*, 54 Md. 499.

The second inquiry, involving "a reasonable estimate of the special benefit conferred upon the property", at least in this instance, involved even more specific inquiry. In accordance with the July 1990 ordinances, *after* completion of the projects, appraisal was made "of the properties specially benefited ... prior to the commencement of the construction of the improvements ... and, in addition ... upon completion of the improvements." This approach is to be distinguished from that involved when, as in *Somerset Co. Sanit. v. Chamberlin*, 254 Md. 630, 255 A.2d 290 (1969), a legislative body determines the overall assessable benefit to *all* properties and apportions that general appraisal on the basis of front footage.

In such event (254 Md. at 638, 255 A.2d 290, quoting *Dinneen v. Rider,* 152 Md. 343, 361–362, 136 A. 754):

The justification for such a special assessment is the benefit to the property upon which the assessment is laid, and it is presumed that the Legislature considered the purposes for which it authorized the assessment not only a public one, but also one which would be of special benefit to the property upon which the assessment is to be laid in proportion to its frontage. As this special benefit is particular to every property abutting on the improvement, it thereby becomes also general in its extent by reason of the universality of its operation upon all the properties in the area [a]ffected. Because of this double aspect, the common benefit may be measured by the standard of the number of feet fronting upon the improvement. . . .

*See also, Montgomery Co. Council v. Summers,* 274 Md. 110, 112, 332 A.2d 646 (1975); *Leonardo v. County Comm., supra,* 214 Md. at 307, 134 A.2d 284.

Article XI of the Rockville Charter did in fact authorize assessment "according to the front foot rule of apportionment or some other equitable basis." Here, the Council did not adopt the former course, but proceeded to determine benefit on a property-by-property basis. In a word, the inquiry of the Council was not general, but property-specific. In terms of *Hyson,* and even *Mont. Co. v. Woodward & Lothrop* upon which the City relies, it meets all tests of what is regarded as "piecemeal" rather than comprehensive, for the very reason that "in comprehensive rezoning proceedings the Council does not consider and determine adjudicative facts concerning particular parties within the contemplation of our decision in *Hyson*" (280 Md. at 712, 376 A.2d 483):

A real distinction exists between piecemeal and comprehensive rezoning hearings; it lies in the nature of the basic function being performed by the zoning authority in each case. In a local map amendment proceeding in Montgomery County, the zoning authority considers a single piece of property and must make a factual determination, based on evidence of record, as to whether there has been a change in

the physical character of the neighborhood where the property is located or a mistake was made in the original zoning. Piecemeal rezoning hearings, therefore, contemplate an adversary or trial-type procedure to resolve adjudicative facts.

[¶] A different determinative standard applies where the Council is considering a comprehensive rezoning by the sectional map amendment process; there its focus is not on a single piece of property, but rather on a considerable number of properties as they relate to each other and to the surrounding area. The Council in that instance considers whether the comprehensive rezoning takes into account future public needs and purposes; whether it is designed to provide an adequate potential for orderly growth in the future and to satisfy local and regional needs; and ultimately whether it bears the requisite relationship to the public health, safety and general welfare. As appellants correctly point out, these are not adjudicative determinations affecting one property owned by one person, but instead are classically legislative determinations designed to affect local and regional needs and all property owners within the planning area. The procedure is fundamentally legislative and no significant quasi-judicial function is involved.

The only matter involved in the hearings before the Rockville Council which came even close to general or public policy concern was the benefit which the City would ultimately derive from the assessment to be made against the Woodmont property. We have no hesitation in viewing the 1993 hearings as being adjudicative to the same degree as those involved in *Hyson*.[29]

---

29. In concluding that the proceeding here was dissimilar to the "comprehensive" application of a "front foot" assessment, we are not to be understood as implying that such is itself without restriction. For example, "the front-foot rule cannot be so mechanically applied as to require the adjacent property owners automatically to pay the total costs of construction without any relation to the special benefit actually conferred upon the property." *Montgomery County v. Schultze*, 302 Md. 481, 492, 489 A.2d 16 (1985).

### Actual prejudice

The City is nearer, but still wide of, the mark in its ultimate argument that "The Club was given a full and complete opportunity to comment on, and criticize the appraisals prepared for the City and to present its own appraisals, both in writing and through live testimony of three expert witnesses who testified for over an hour."

As expounded by the City, the proposition seems to have two dimensions, the first being that the participation which the Council did allow Woodmont was the functional equivalent of cross-examination.[30] In *Birckhead v. Board of Co. Comm'rs, supra,* 260 Md. at 600, 273 A.2d 133, the Court of Appeals noted that "Ordinarily, the opportunity of denial and rebuttal is not a substitute for cross-examination." [31] Earlier, Judge Oppenheimer very specifically stated for the Court of Appeals in *Town of Somerset v. Board, supra,* 245 Md. at 65, 225 A.2d 294, that "the rule that in an adversary proceeding before an administrative board, the opportunity for reasonable cross-examination is a basic right." Even the right to call persons as adverse witnesses provides no adequate substitute (245 Md. at 66, 225 A.2d 294):

> The right of a party to call hostile witnesses as its own after the testimony of the adverse party has been complet-

---

**30.** "The Club was afforded an extraordinary opportunity to address the issues and to make known its objections to the proposed assessment; an opportunity in excess of the eight (8) minute limit on testimony (plus unrestricted right to submit written material) approved for the legislative hearing in *Montgomery County v. Woodward and Lothrop, supra,* and greater than the one hour for testimony and 10 days for filing written evidence afforded the appellants in *Hyson.*"

**31.** There, "The protestants were told of the procedure that would be followed in obtaining the information wanted and were kept fully aware of all that the Council received—essentially in its legislative capacity— and took the opportunity offered them to rebut that information and present their own views, conclusions and arguments"; and it was only "in view of the peripheral and oblique nature and type of the information sought and received" that the Court found "no deprivation of fundamental procedural rights in the Council's limiting the protestants to written rebuttal on the legislative aspects of the case."

ed, in our opinion, is not the substantial equivalent of the right to cross-examine immediately after the direct testimony of the witness has been concluded. The techniques of advocacy so essential to our system of justice are largely stultified when resort must be had to such a cumbersome and delayed substitute for immediate and direct cross-examination.

Perhaps sensing the weakness of the argument that what was allowed was sufficient substitute for cross-examination, the City wanly asserts that Woodmont has shown no prejudice.[32] Although no authority is cited for this proposition, it is true that in *Hyson, supra,* the Court of Appeals held that "although cross-examination should have been allowed if properly requested, the slight denial here (if it can properly be termed a denial under the circumstances) has not been shown to have prejudiced the protestants' cause" (242 Md. at 71–72, 217 A.2d 578).[33]

However, as soon thereafter explained in *Town of Somerset v. Board, supra,* 245 Md. at 66–67, 225 A.2d 294:

The appellants' contention that actual prejudice must be shown before denial of procedural due process can be established is without merit ... [citations omitted]. It would be a mockery of justice to hold that a person cannot

---

**32.** "At no time during these entire proceedings has the Club indicated what additional information it could have brought out by formal cross-examination that it was unable to reasonably present in its critique of the City's appraisals and the testimony of its experts. Nor has the Club demonstrated how the procedures employed by the Mayor and Council deprived it of any right to which it was entitled."

**33.** The actual holding was that "After examining and re-examining the record, we are unable to find a denial of appellants' request to cross-examine any specific witness or 'material.' ... Consequently, we are unable to hold that error on this score was committed." 242 Md. at 68, 217 A.2d 578. In fact, the Court indicated that the matter could have turned on this issue without a full discussion of the right of cross-examination "but, since the question was raised and discussed in the briefs by both sides, also argued by them at the hearing in this Court, and we consider it one of significance, we preferred to treat it as we have...."

complain of the denial of the right to cross-examine unless he can show what the result of the cross-examination would have been; that result is often as unexpected as it is revealing.

[¶] Chief Judge Prescott's statement in *Hyson*, at 242 Md. 71–72, 217 A.2d 578, that, under the circumstances, any denial of the right of cross-examination 'has not been shown to have prejudiced the protestants' cause' is to be taken in the context of his finding that cross-examination, in effect, had been waived. There was no prejudice because there had not been, in substance, a denial of the right. In this case, the right had been vigorously and repeatedly asserted, and its denial vitiated the proceedings.

Later cases do not retreat from this position. For example, in *Birckhead v. Board of Co. Comm'rs, supra*, 260 Md. at 600, 273 A.2d 133, it was held that:

Ordinarily, the opportunity of denial and rebuttal is not a substitute for cross-examination but *in view of the peripheral and oblique nature and type of the information sought and received*, we find no deprivation of fundamental procedural rights in the Council's limiting the protestants to written rebuttal on the legislative aspects of the case. We think the 'basic rules of fairness' as to parties before the Council were observed ... and that there were preserved 'the fundamentals applicable to the decision of adjudicative facts.' [Emphasis supplied]

Similarly, in *Rogers v. Radio Shack, supra*, 271 Md. at 129, 314 A.2d 113, a report had been placed in the record following a hearing. The Court "agree[d] ... that under the circumstances here, with no opportunity for cross-examination or rebuttal, fundamental fairness would preclude reliance upon the report by an administrative agency or a reviewing court", but found that "neither the Board of Appeals nor the circuit court placed any weight upon the investigator's report."

In *Dickinson–Tidewater v. Supervisor, supra*, 273 Md. at 254, 329 A.2d 18, it was held that "Where ... the facts upon which a witness relies for his expert opinion come as no

surprise to the complaining parties, and, indeed, are actually presented by the latter in the first instance, absent any other basis for so contending, no violation of the basic rules of fairness is manifested", but it was also recognized that *"extensive cross-examination which appellants were afforded* and exercised merely reinforces this conclusion [emphasis supplied]."

Moreover, having reviewed the extensive record in this case, we would be hard pressed to conclude that actual prejudice was not present. Ultimately, the Council placed exclusive reliance upon its two appraisers, although its determination seems to involve something akin to no more than a flip of the coin. Woodmont presented substantial evidence which, if believed, indicated that such appraisals proceeded upon improper predicates or were otherwise flawed. This is the sort of material to which cross-examination may be especially effective. Judge Oppenheimer's characteristically wise observation bears repeating: the "result [of cross-examination] is often as unexpected as it is revealing."

We hold that the denial of cross-examination at the hearings of May 17 and June 21, 1993, was fundamentally unfair and violative of Woodmont's right to due process of law.

### Valuation based upon potential use

■ Woodmont urges that "Special assessments against country clubs must be based on country club use and not the hypothetical highest and best use of the property." As this will have direct effect upon any further assessment proceedings, we express our concurrence in the view of the lower court that the contention is without merit.

We first observe that there is nothing inherently improper in basing special assessments upon "highest and best use", even though that use may be merely potential. In *V.F.W. v. Montgomery County, supra,* an affiliate of the Veterans of Foreign Wars made the argument, not dissimilar to that of Woodmont here, that a certain 6–acre parcel was " 'acreage' property, not lots in a subdivision . . . [and] that any benefit to

its land could be realized only through a change of use of the land by its development as suburban lots, which possible use, it claims, is remote and speculative" (207 Md. at 444, 115 A.2d 249).[34]

Speaking for the Court, Chief Judge Brune noted that "The law is firmly established in Maryland that in order to justify a special assessment for a local improvement such as the paving of a street, there must be both a public purpose and a special benefit to the properties to be assessed over and above that accruing to the public" and that "The difficulty of balancing the necessary public interest and the required special benefits to particular properties has often led to imposing a part of the cost on the community at large through general taxation and a part on properties specially benefited" (207 Md. at 448, 115 A.2d 249).

The Court squarely held that the Post's contention that "the asserted enhancement in value could be realized only through abandoning the ... present use of the acreage and converting it into a suburban subdivision" was beside the point. Quoting *Cons. G.E.L. & P. Co. v. M. & C.C. of Balto.*, 130 Md. 20, 99 A. 968 (1917), it said:

It would be a very illogical rule which would require damages to be estimated with due regard to all the uses to which the land may be adapted, and would exclude from consideration all but its actual and present use for the purposes of the benefit assessment. The sole object of the inquiry, from either point of view, is to determine the comparative market values of the property before and after the appropriation of a part for the intended public use, and in ascertaining those values, with reference to either period, all the available uses of the land may properly be considered.

---

**34.** Interestingly, the Court noted that the Post had raised below, but not on appeal: "that the purpose of the street improvement was to benefit the public generally through greatly improved access to a new County school located at the end of the improved street, rather than to benefit the abutting landowners."

An "objection to the application of the front foot rule of assessment on the ground that its land is rural" was found to be "really a variation of the objection to considering the use of its land for any purpose other than that to which it is presently" (at 450, 115 A.2d 249). A similar response was made under still more apposite circumstances in *Beauchamp v. Somerset County*, 243 Md. 98, 103, 220 A.2d 135 (1966), to an argument that "the present assessment will force the conversion of its agricultural land to non-agricultural uses, which result, it asserts, is contrary to the legislative intent" regarding agricultural uses.

We thus regard it as settled law that consideration of what was described in the *VFW* case as the "most valuable monetary use" [35] of Woodmont's property was, in addition to being proper, under ordinary circumstances, legally required. Nor does the prior history of the Woodmont property suggest that contemplation of a more valuable use is either conjectural or even improbable.[36]

### 'Country club' assessment

Indeed, the City had no authority to exempt Woodmont's property from the special assessment. In *Church Home v. Baltimore*, 178 Md. 326, 333, 13 A.2d 596 (1940), it was stated that "a municipality has no power to exempt land and other property from special assessment. Where the General Assembly possesses such a power, the asserter of the exemption

---

**35.** "The testimony is sufficient to support the County's contention that the assessment against the property owned by the Post does not exceed the enhancement in its value due to the paving, if the land is used for suburban development purposes, which is, in the words of the Chancellor, 'its most valuable monetary use' " (207 Md. at 448, 115 A.2d 249).

**36.** In addition to the very significant price which it received from the City in connection with its sale in connection with the construction of Wootton Parkway (see footnote 5), note may be made that, in 1981, Woodmont sold separate portions of its land to Hines Industrial Limited and Rockmont Associates, thereby generating "deferred real property taxes" of more than $182,000 under hereafter-noted provisions of the Tax—Property Article of the *Code*. *See, Woodmont Country Club v. Montgomery Co.*, 61 Md.App. 229, 233–234, 486 A.2d 218 (1985).

must show a clear and unambiguous legislative law in support of his contention."

Woodmont finds not only permission, but controlling exemption in the provisions of §§ 8–212 *et seq.* of the Tax—Property Article of the *Code,*[37] which as recently noted in *State v. Burning Tree Club, Inc.,* 315 Md. 254, 258, 554 A.2d 366 (1989), "authorized the State to enter into agreements with private country clubs under which the clubs would maintain their land as open spaces in exchange for favorable assessment of those lands for property tax purposes." Woodmont, which has entered into such an agreement with the State,[38] argues that this statutory scheme "contains both a positive mandate as to assessments for property tax purposes and a prohibition against valuation as other than a country club for any other purpose." This view of the statute is wholly unwarranted.

To begin with, as noted earlier, a recognized distinction exists between property taxes and special assessments. *Williams v. Anne Arundel County, supra,* 334 Md. at 118, 638 A.2d 74. Although acknowledging the distinction, Woodmont erroneously asserts that "nowhere in the statutory scheme providing for valuation, assessment and taxation of country clubs is there a limitation of its applicability to simply *ad valorem* property taxes." "Assessment" of real property is defined as "the adjusted value to which the *property tax* rate may be applied [emphasis supplied]" (TP § 1–101(c)); and " 'Property tax' means the property tax imposed by: (1) the State; (2) a county; or (3) a municipal corporation" (TP § 1–101(aa)). When applied to a municipality such as Rockville, "property tax . . . means the tax on property authorized under §§ 6–203 and 10–102 through 10–105 of this article," with the important exception that " 'Municipal corporation property tax' does *not* include a tax imposed on property specifically

---

**37.** Provisions of the Tax—Property Article are hereafter cited as "TP § ".

**38.** *See, Woodmont Country Club v. Montgomery Co., supra.*

benefited by local improvements [emphasis supplied]" (TP § 1–101(t)).[39]

As Woodmont recognizes none of these provisions, it of course does not appreciate their profound effect upon the provisions to which it does refer. For example, it is correctly noted that TP § 8–101(b)(4) recognizes "land of a country club" as a sub-class of real property; but, by subsection (a), such is "[f]or assessment purposes." Since "assessment" is defined as exclusively applicable to "property tax" (which, in turn, expressly does not involve "a tax imposed on property specifically benefited by local improvements"), the classification has no meaning here. The short of the matter is that, as stated in the above quotation from *Burning Tree*, special country club valuation within the Tax—Property Article relates solely to "assessment . . . for property tax purposes", as clearly distinguished from assessment for special benefit.

For reasons stated earlier, we conclude that the denial of Woodmont's right to cross-examination at the 1993 hearings of the Rockville Council represented denial of a fundamental right to due process of law and vitiates those proceedings and the ordinances upon which they were predicated. The judgment of the Circuit Court must therefore be reversed, with instructions to reverse the action of the City of Rockville in accordance with Rule 7–209 and remand the action for such proceedings as may be authorized by law and consistent with this opinion for determination and assessment of special benefit in connection with the construction of Wootton Parkway, the water main and other related facilities which were the subject of the ordinances # 13–93 and # 14–93 of the Mayor and Council of Rockville.

ORDER OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED AND CASE REMANDED WITH INSTRUCTIONS TO REVERSE THE ACTION OF THE MAYOR AND CITY COUNCIL OF ROCKVILLE

---

**39.** TP § 1–101(h) similarly excepts special benefit assessments in defining "County property tax."

AND REMAND THE ACTION TO THE MAYOR AND CITY COUNCIL FOR WHATEVER FURTHER PROCEEDINGS MAY BE AUTHORIZED BY LAW AND CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.