705 A.2d 301

MAYOR AND COUNCIL OF ROCKVILLE

v.

WOODMONT COUNTRY CLUB.

No. 35, Sept. Term, 1996.

Court of Appeals of Maryland.

Feb. 10, 1998.

Sondra Harans Block (Paul T. Glasgow, on brief), Rockville, for Petitioner/Cross–Respondent.

Stephen J. Orens (Wendy Pullano, Eileen T. Basaman, Deborah L. Moran, Conroy, Ballman & Dameron, Chartered, on brief), Gaithersburg, for Respondent/Cross–Petitioner.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI,* RAKER and WILNER, JJ.

ELDRIDGE, Judge.

This case involves a challenge to the procedures used by the Mayor and Council of Rockville in levying special assessments

---

* Karwacki, J., now retired, participated in the hearing of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of the opinion.

against the property of the Woodmont Country Club for the construction of a road and water transmission main. We issued a writ of certiorari primarily to decide whether the country club was entitled to cross-examine appraisers commissioned by the City of Rockville at a hearing to value the special benefit accruing to the club as a result of the construction project.

## I.

Woodmont Country Club is located on approximately 459 acres in Rockville, Maryland, and is zoned R–E (Residential Estate), although it abuts both residential and commercial development.

The Mayor and Council of Rockville is a municipal corporation organized under Article XI–E of the Constitution of Maryland, and is authorized by Article XI of its Charter to assess the costs of public improvement projects against private property specially benefitted thereby. Article XI of the Charter lays out procedures to be followed by the Mayor and Council before levying any special assessments. Specifically, and most relevant here, Article XI, § 1, states as follows (emphasis added):

"c. Before entering upon the construction of any work or improvement specified herein, the Council shall by ordinance designate the location, extent and kind of work or improvement proposed to be done or made, the kind of materials to be used, the estimated cost of the improvement and the real property which will be specially benefited thereby and which it is proposed to assess to pay all or any part of the cost thereof, *and shall fix a time and place when and where the owner or owners of the property to be so assessed therefor can be heard in reference thereto.* Notice of such hearing, embodying the substance of said ordinance, shall be served upon the owners of said properties....

"d. *If after the hearing* the Council shall be of the opinion that the public health, safety, welfare, comfort, or convenience requires the work or improvement to be done or

made, *it shall provide by ordinance for the same and may charge the expense thereof or any part of such expense against the property which it shall find to be specially benefited thereby* according to the front foot rule of apportionment or some other equitable basis as may be determined by it; * * * *The Council shall also provide in said ordinance* the time and terms upon which payment of said assessments for said work and improvements shall be made by said property owners, the rate of interest, if any, that shall be charged upon deferred payments and shall provide penalties for failure to pay any deferred payment when due. * * * *Any person aggrieved by the levy of a special assessment in accordance with the provisions of this Article may appeal the same to the Circuit Court for Montgomery County.*"

Thus, the Charter contemplates a two-step process in making special assessments for public improvements. First, the Council must enact an ordinance explaining the particulars of the improvement and which properties are expected to be specially benefitted by it, and must establish a time and place for a hearing at which the property owners proposed to be assessed may be heard. Second, if *after the hearing* the Council believes that the improvement is required, it must provide by ordinance for its construction. Additionally, it must provide *in the same ordinance* for the levy of special assessments against property found to be specially benefitted either by the front foot method or some other equitable basis, and must include the time and terms of payment, the interest rate for deferred payments, and any penalties for late payments.

As part of its Master Plan, Rockville designed and planned a road, Wooton Parkway, as "a major east-west traffic corridor and an alternative to going through the Town Center," and a related water main, which would cut through the Woodmont property. To that end, on March 28, 1990, after negotiations, the Council accepted Woodmont's offer to sell

approximately 20.3 acres of land for construction of the roadway and water main at a cost of $6,400,000.[1]

On May 14, 1990, the City adopted two ordinances, 12–90 and 13–90, proposing construction of the road and water main and providing for a hearing to be held on June 4, 1990. Notice was sent to the owners of five properties proposed to be assessed for the cost of the roadway and water main, including Woodmont. The other properties identified included property owned by D.F. Antonelli (commercial property near the intersection of Wooton Parkway and Rockville Pike), Rockville Pike Joint Venture (the Wintergreen Plaza Shopping Center), Donald N. and P.E. Coupard (the Congressional Oldsmobile dealership), and Tower–Dawson Limited Partnership (the Tower Oaks mixed-use site to be developed subsequently).[2]

After the June 4th hearing, the Council adopted two further ordinances, 18–90 and 19–90, officially authorizing construction of the roadway and water main. The Council did not, however, specify which properties it found to be specially benefited, what basis for assessment would be used (front foot or some other equitable basis), or what the terms of payment, interest rates and penalties would be. Rather, the Council merely directed the City Manager to "cause appraisals of the proper-

---

1. Initially, the City had offered to purchase 15.83 acres from Woodmont (representing the total amount of land necessary for the roadway construction). Although the property was valued at $4,995,000.00, the City offered to pay only $4,000,000.00 coupled with a waiver of any future special assessment. Woodmont rejected this offer, apparently because the construction of the roadway would leave approximately 5 acres of country club property severed from the rest of the club. Therefore, Woodmont requested that the City purchase that residual property in addition to the 15.83 acres required for the roadway. The City agreed to purchase the total amount of 20.3 acres at a price of $6,400,000.00, but withdrew its offer to waive any future special assessment and rejected Woodmont's request that any assessment be deferred until such time as the club was developed. Subsequently, the City levied a special assessment against Woodmont in the amount of $2,943,000.00, which is the subject matter of this appeal.

2. Only the Woodmont, Tower–Dawson and Antonelli properties were proposed to be assessed in connection with the water main.

ties specially benefited by the proposed public improvements to be made prior to the commencement of the construction ... and, in addition, to cause appraisals to be made upon completion of the improvements...." The Council did not make clear how the appraisals would be used or how any assessments would be determined.

Two appraisals were then made by the City for each of the Woodmont, Congressional Oldsmobile, and Wintergreen properties as to their highest and best use. The construction was completed at a total cost of $24,060,725.00 for Wooton parkway and $946,952.79 for the water main. At that point two fresh appraisals were made by the City for each property, apparently to determine the amount of special benefit accruing to the three properties as a result of the construction. No appraisals were made of the Antonelli or Tower–Dawson properties because the owners of those properties had entered into negotiated "assessment agreements" with the City.

Based on the appraisals and the assessment agreements, two additional proposed ordinances were introduced in the Council on March 22, 1993, to levy special assessments for the construction. The ordinances proposed an assessment of $3,057,816.69 against the Tower–Dawson property for the roadway and $74,226.93 for the water main, based on the negotiated assessment agreement. Similarly, based on an assessment agreement, the ordinances proposed an assessment against the Antonelli property in the amounts of $100,-000.00 for the roadway and $18,750.06 for the water main.

The ordinances proposed no assessments against the Wintergreen and Congressional Oldsmobile properties, based on the before-and-after appraisals made of those two properties. As noted previously, the City had commissioned two separate appraisals for each of the properties involved. With respect to the Wintergreen property, one appraiser estimated $270,-000.00 in special benefit, while the other appraiser estimated zero special benefit. With respect to the Congressional Oldsmobile property, one appraiser estimated $700,000.00 in special benefit, while the other appraiser estimated zero. To

resolve these disparities, the City engaged a third appraiser to evaluate the first two appraisals of the Wintergreen and Congressional properties. In each case, the third appraiser determined that the property was not specially benefitted. Therefore, the ordinances proposed no assessment against these properties.

Regarding the Woodmont Country Club property, one appraiser valued the special benefit from the construction of the roadway at $2,650,000.00, while the second appraiser valued the benefit at $3,236,000.00. Each appraisal was based on a highest and best use valuation. The ordinances proposed an assessment based on an amount equal to the average of these two appraisals, $2,943,000.00. The ordinances also proposed a special assessment against the Woodmont property for the water main in the amount of $61,319.38, apparently based on a front foot charge.

The Council set a hearing date on these proposed assessments for May 17, 1993. Woodmont requested, both in writing and orally, that the hearing be postponed to allow it time to prepare its testimony and that the City's appraisers be present at the hearing for cross-examination. The City denied the request that the appraisers be asked to attend, but it agreed to continue the hearing until June 21, 1993. Woodmont renewed its request that the appraisers be available for cross-examination. The City again denied the request, informing Woodmont that "cross-examination [would] not be granted and that the City's appraisers and other consultants [would] not be present at [the] hearing."

Woodmont was the only property owner to appear at the hearing on May 17 and the continuation of the hearing on June 21. The owners of the Oldsmobile and Wintergreen properties did not appear because of the proposed zero assessments against their property. The owners of the Antonelli and Tower–Dawson properties did not appear in light of their previously negotiated assessment agreements. At the hearing, Woodmont again renewed its request to cross-examine the City's appraisers, and the request was denied for a third time.

Woodmont then presented testimony by a traffic consultant, a land planner and a land appraiser which generally disputed the appraisals prepared by the City's appraisers. Woodmont's appraiser testified and submitted an appraisal that the special benefit to the country club as a result of the roadway construction was not more than $872,500.00. Alternatively, Woodmont argued to the Council that in valuing any special benefit to the club, the Council should not consider its highest and best use, but only its use as a country club, resulting in zero special benefit.

After the hearing, at the request of the City Attorney, the City's appraisers reviewed and evaluated the appraisal offered by Woodmont. The City's appraisers sent correspondence to the City disputing the appraisal offered by Woodmont and reaffirming their own appraisals. After discovering this exchange of correspondence, Woodmont objected to the City's solicitation of these additional reports without affording Woodmont any notice or opportunity to respond or to cross-examine the City's appraisers. The City then gave Woodmont time to respond to these additional reports.

On September 27, 1993, the Council adopted two final ordinances, 13–93 and 14–93, officially levying the special assessments for the roadway and the water main. The assessments were levied in the exact amounts initially proposed in the ordinances adopted on March 22, 1993. Also, these ordinances contained detailed payment schedules and provided for penalties for late payments.

Woodmont then sought judicial review of the assessments in the Circuit Court for Montgomery County, which upheld the assessments. Woodmont appealed to the Court of Special Appeals which reversed the circuit court's decision and ordered that the case be remanded to the Council for further proceedings consistent with the court's opinion. *Woodmont C.C. v. Rockville,* 107 Md.App. 696, 670 A.2d 968 (1996). The Court of Special Appeals held that the proceedings levying the special assessments on Woodmont were invalid because of the denial of Woodmont's request to cross-examine the City's

appraisers. In so doing, the intermediate appellate court rejected the City's assertions that the 1993 hearings were not required, and that, even if the hearings were required, Woodmont had no right of cross-examination at those hearings because the City was engaged in a "legislative" function. The appellate court also rejected Woodmont's arguments that it was improper for the Council to consider the special benefit to the club based on its highest and best use, and that the Council could only consider its current use as a country club, which would result in a finding of no special benefit.

The City and Woodmont filed petitions for a writ of certiorari, and this Court granted both petitions. 342 Md. 507, 677 A.2d 583 (1996). The City's petition for a writ of certiorari presented the following question:

"In a legislative proceeding to levy special assessments for a public improvement project, do the owners of benefited properties have a right to cross-examine the independent appraisers commissioned by the City to value the special benefit where, prior to the special assessment levy, the property owners are given the opportunity to oppose and criticize the appraisals and to present their own appraisals and testimony?"

Woodmont's cross-petition for a writ of certiorari presented the following questions:

"1. Whether the Court of Special Appeals erred in determining that the valuation of special benefits based on a hypothetical 'highest and best' use of a property rather than the existing country club use constituted a 'definite and just plan' under case law and an 'equitable basis' under the City's Charter when such valuation is against public policy, is too unreasonable and speculative, and was not uniformly applied?

"2. Whether the Court of Special Appeals erred in determining that the valuation of special benefits based on the hypothetical 'highest and best use' of a property rather than the existing country club use was proper in light of the legislative intent behind the Tax–Property Article provisions

enacted to protect country clubs from economic pressures caused by assessments at levels incompatible with the practical use of such property for country clubs?

"3.  Whether the assessments should be voided as illegal based on the failure of the City to comply with the mandate of its Charter regarding the process and procedures for levying special assessments, which required a finding of special benefit in advance of the commencement of the improvement project?"

Because we agree that the City erred in refusing to allow Woodmont reasonable cross-examination, and that new administrative proceedings will be required, we need not address the other issues raised by Woodmont.[3]

## II.

 Under Maryland law, as the City apparently concedes, the right of reasonable cross-examination attaches to adjudicatory administrative hearings.  This Court held in *Hyson v. Montgomery County,* 242 Md. 55, 67, 217 A.2d 578, 585 (1966), that "when an administrative board or agency is required to hold a public hearing and to decide disputed adjudicative facts based upon evidence produced and a record made, ... a reasonable right of cross-examination must be allowed the parties." *See, e.g., Birckhead v. Board of Co. Comm'rs,* 260 Md. 594, 599, 273 A.2d 133, 136 (1971); *Bayer v. Siskind,* 247

---

**3.**  With regard to the first and third issues raised in Woodmont's cross-petition, while the Court of Special Appeals rejected their contentions, we shall not address them because it appears that neither contention was raised before the Council.  Judicial review of administrative decisions is limited to issues raised before the agency.  *See Insurance Commissioner v. Equitable Life,* 339 Md. 596, 634, 664 A.2d 862, 881 (1995), and cases there cited.  Consequently, the Court of Special Appeals should not have reached these issues either.  With regard to the second issue raised in Woodmont's cross-petition, although it appears to have been raised before the Council, it would be premature for us to address it at this time.  Since, as a result of our decision in this case, further proceedings before the Council will be required, neither the Court of Special Appeals' opinion regarding these issues, nor our failure to reach them today, will preclude Woodmont from raising the three issues before the Council in the subsequent proceedings.

Md. 116, 123, 230 A.2d 316, 319–320 (1967); *Town of Somerset v. Board,* 245 Md. 52, 65–66, 225 A.2d 294, 302–303 (1966); *Gorin v. Board of Co. Comm'rs,* 244 Md. 106, 110, 223 A.2d 237, 239 (1966) ("While proceedings before an administrative board are informal and the strict rules of evidence do not apply, when the board is functioning in an adversary proceeding, the fundamentals applicable to the decision of adjudicative facts by any tribunal must be preserved"). *Cf. West Mont. Ass'n v. MNCP & P Com'n,* 309 Md. 183, 197, 522 A.2d 1328, 1335 (1987) (no trial-type hearing required in connection with the determination of legislative facts); *Montgomery Co. v. Woodward & Lothrop,* 280 Md. 686, 707–714, 376 A.2d 483, 495–498 (1977), *cert. denied,* 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978) (no trial-type hearing required in comprehensive rezoning, which is a quasi-legislative proceeding).

The City defends its summary denial of Woodmont's requests for cross-examination of the City's appraisers at the 1993 special assessment hearing, however, by asserting that the hearing was not adjudicatory but was legislative. Alternatively, the City asserts that Woodmont's opportunity to rebut the reports offered by the City's appraisers was a reasonable substitute for cross-examination.

### A.

Contrary to the City's assertion, the special assessment hearing in May and June 1993 was adjudicatory in nature. The purpose of the 1993 hearing was to decide, based upon the 1990 legislative determinations, the particular amount of the special assessment to be levied based on the amount of benefit to a specific piece of property. This is classically the type of adjudicatory determination, to which the right of cross-examination attaches, contemplated by the above-cited opinions of this Court.

The City contends that the hearings were legislative, rather than adjudicatory, because "[s]pecial assessments are in the nature of a tax, and, like taxes, are legislative actions.... Like all legislative actions, a finding by the Mayor and Council

of Rockville that special benefit exists is presumed to be correct and constitutional, 'even if the legislative body acted without any evidence at all.' " (City's brief at 14). The City's argument, however, confuses the legislative aspects of the special assessment process with the adjudicatory aspects of that process.

This Court has stated that the determination of *whether* to impose a special assessment and the *mode* of imposing a special assessment are legislative determinations. *Montgomery County v. Schultze,* 302 Md. 481, 490–491, 489 A.2d 16, 20–21 (1985); *Somerset Co. Sanit. v. Chamberlin,* 254 Md. 630, 636–637, 255 A.2d 290, 293 (1969); *Leonardo v. County Com'rs,* 214 Md. 287, 307, 134 A.2d 284, 294, *cert. denied,* 355 U.S. 906, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957), *and reh'g denied,* 355 U.S. 967, 78 S.Ct. 534, 2 L.Ed.2d 543 (1958) ("The mode of assessment is a legislative question"). Nevertheless, the application of the mode of assessment to a particular piece of property to determine the specific amount to be assessed against that particular property is an adjudicative act. The proceeding to determine the amount of benefit to a specific piece of property is adjudicatory or quasi-judicial.

In *Hyson v. Montgomery County, supra,* 242 Md. 55, 217 A.2d 578, this Court held that parties to a hearing for a zoning reclassification were entitled to cross-examine witnesses at the hearing because the Montgomery County Council was required to "resolve disputed questions of adjudicative facts (as contradistinguished from legislative facts or judicial *action* ) concerning particular parties." 242 Md. at 64, 217 A.2d at 584. The Court reached this determination despite the fact that "the *actual acts of zoning* and *rezoning* are legislative or quasi-legislative in nature." 242 Md. at 63, 217 A.2d at 583. This Court pointed out that the process of rezoning may be characterized as quasi-legislative or quasi-judicial at different stages, particularly when the Council was required to determine "facts concerning particular parties." 242 Md. at 65, 217 A.2d at 584. Quoting from *Board v. Levitt & Sons,* 235 Md. 151, 158, 200 A.2d 670, 674 (1964), Chief Judge Prescott stated for the Court (242 Md. at 66, 217 A.2d at 585):

" 'We have repeatedly held that the action of zoning or reclassification of zoning is a function that is legislative in nature. However, this does not prevent the Council from making *administrative* findings of fact, drawing administrative inferences, and arriving at administrative conclusions and decisions, when hearing an application for rezoning.... After making its administrative findings of fact, etc., the Council is then in a position to exercise its legislative function of granting or denying the petition for reclassification.' "

The Court went on to note (*ibid.*) that "[i]n *Woodlawn Area Citizens Ass'n, Inc. v. Bd. of Co. Com'rs,* 241 Md. 187, [192, 216 A.2d 149, 153 (1966),] we again pointed out that although the action of the Council in Prince George's County 'in rezoning in individual cases is ultimately legislative, it is clear that in performing this delegated and restricted function it acts largely as an administrative or adjudicatory agency.' "

■ Thus, the determination of whether the Council is acting in a quasi-judicial or quasilegislative manner is dependent upon the nature of the particular act in which it is engaged. In a case such as this, where the Council was holding a hearing, receiving written and oral testimony, and considering evidence to determine the specific amount of special benefit to a particular piece of property, the Council at that point was acting in a quasi-judicial capacity, even if earlier actions in the process or the final act of passing an ordinance to levy a special assessment constitute legislative functions.

■ A further indication that the 1993 hearing was adjudicatory is the fact that under the scheme in the City Charter, Art. XI, § 1(d), any person "aggrieved" by the levy of a special assessment may obtain judicial review in the Circuit Court for Montgomery County. Only adjudicatory decisions of agencies, however, are subject to full judicial review, not legislative decisions. *See, e.g., County Council v. Offen,* 334 Md. 499, 507, 639 A.2d 1070, 1073–1074 (1994); *Medical Waste v. Maryland Waste,* 327 Md. 596, 608–611, 612 A.2d 241, 247–

248 (1992); *Sugarloaf Citizens Ass'n v. Northeast Maryland Waste Disposal,* 323 Md. 641, 671–672, 594 A.2d 1115, 1130 (1991); *Dep't of Nat. Res. v. Linchester,* 274 Md. 211, 223–224, 334 A.2d 514, 522–523 (1975).

Despite the rather straightforward application of *Hyson v. Montgomery County, supra,* called for by this case, the City maintains that our decision in *Montgomery Co. v. Woodward & Lothrop, supra,* 280 Md. 686, 376 A.2d 483, requires a different result. In that case, the Court held that there was no right of cross-examination at sectional map amendment hearings to effectuate a comprehensive rezoning plan. *Woodward & Lothrop, supra,* 280 Md. at 713, 376 A.2d at 498. The City argues that the special assessment levied against Woodmont in this case is more like the comprehensive rezoning at issue in *Woodward & Lothrop* than the piecemeal rezoning at issue in *Hyson.* The City's reading of *Woodward & Lothrop,* however, is inaccurate. In *Woodward & Lothrop,* the Court reviewed and explained the earlier decision in *Hyson,* noting that the decision in *Hyson* was based largely on the distinction between legislative and adjudicative facts. 280 Md. at 711, 376 A.2d at 497. Chief Judge Murphy, writing for the Court in *Woodward & Lothrop,* stated (280 Md. at 711–713, 376 A.2d at 497–498) (emphasis added):

"The difference between adjudicative and legislative facts is not easily drawn; ... *adjudicative facts are facts about the parties and their activities, businesses and properties* ... while legislative facts '*do not usually concern the immediate parties* but are general facts which help the tribunal decide questions of law and policy and discretion.' ... *The difference, broadly speaking, involves whether the decision is to be made on individual or general grounds.*

\*     \*     \*

"[I]n comprehensive rezoning proceedings the Council does not consider and determine adjudicative facts *concerning particular parties* within the contemplation of our decision in *Hyson.* A real distinction exists between piecemeal and comprehensive rezoning hearings; it lies in the nature of

the basic function being performed by the zoning authority in each case. In a local map amendment proceeding in Montgomery County, the zoning authority *considers a single piece of property* and must make a factual determination, based on evidence of record, as to whether there has been a change in the physical character of the neighborhood where the property is located or a mistake was made in the original zoning. Piecemeal rezoning hearings, therefore, contemplate an adversary or trial-type procedure to resolve adjudicative facts. A different determinative standard applies where the Council is considering a comprehensive rezoning by the sectional map amendment process; there its *focus is not on a single piece of property,* but rather on a considerable number of properties as they relate to each other and to the surrounding area. The Council in that instance considers whether the comprehensive rezoning takes into account future public needs and purposes; whether it is designed to provide an adequate potential for orderly growth in the future and to satisfy local and regional needs; and ultimately whether it bears the requisite relationship to the public health, safety and general welfare.... [*T* ]*hese are not adjudicative determinations affecting one property owned by one person,* but instead are classically legislative determinations designed to affect local and regional needs and all property owners within the planning area. The procedure is fundamentally legislative and no significant quasi-judicial function is involved."

Under the principles set forth above, it is clear that the 1993 hearing regarding the amount of special benefit to Woodmont was adjudicative in nature, even though some other aspects of the special assessment function were legislative. For example, the decision whether to build Wooton Parkway and the water main, the decision whether to assess specially a portion of the costs of construction, and the decision as to the method by which any special benefit should be determined, are all properly characterized as legislative. *See, e.g., Montgomery County v. Schultze, supra,* 302 Md. 481, 489 A.2d 16; *Somerset Co. Sanit. v. Chamberlin, supra,* 254 Md. 630, 255 A.2d

290; *Leonardo v. County Com'rs, supra,* 214 Md. 287, 134 A.2d 284. All of these decisions were made on general grounds and involve questions of "policy and discretion." *Woodward & Lothrop, supra,* 280 Md. at 712, 376 A.2d at 497. These decisions are of a general nature, and are "designed to affect local and regional needs and all property owners within the planning area." 280 Md. at 713, 376 A.2d at 498.

The determination of the amount of special benefit to Woodmont's property, in contrast, is a classic adjudicative-type determination based on adjudicative facts. It concerns questions about the immediate party and its property, and the "decision is to be made on individual ... grounds." *Woodward & Lothrop, supra,* 280 Md. at 712, 376 A.2d at 497. In determining the amount of special benefit to Woodmont's property, the Council must "consider[ ] a single piece of property and must make a factual determination ... as to whether" and in what amount Woodmont's property was benefitted. 280 Md. at 712, 376 A.2d at 498. In making this decision, necessarily the Council's "focus is ... on a single piece of property." 280 Md. at 713, 376 A.2d at 498. When making this decision, no longer is the Council concerned with such general policy matters as whether to build the road, whether to specially assess abutting property owners, and what method to use in levying the special assessments. Rather, the Council is engaged in applying the method of assessment to a particular piece of property, and this is a quasi-judicial function which "contemplate[s] an adversary or trial-type procedure to resolve adjudicative facts." *Ibid.*

■ The City further argues that the Court of Special Appeals improperly created a new "distinction between special assessments based on frontage and those based on appraisals" (City's brief at 30) in holding that the assessment hearings in this case were adjudicatory. In making this argument, the City seizes upon the Court of Special Appeals' statement that the City's methodology of estimating special benefit to Woodmont's property (before and after appraisals) involved "specific inquiry," and that "[t]his approach is to be distinguished

from that involved when . . . a legislative body determines the overall assessable benefit to *all* properties and apportions that general appraisal on the basis of front footage." *Woodmont C.C. v. Rockville, supra,* 107 Md.App. at 722, 670 A.2d at 981. The City apparently reads this statement by the Court of Special Appeals to mean that assessments based on appraisals are adjudicatory or quasi-judicial while assessments based on front-footage are quasi-legislative. The City asserts that this distinction drawn by the intermediate appellate court is unwarranted, and that there is no distinction between appraisal-based assessments and front-foot assessments. Appraisal-based assessments, according to the City, are quasi-legislative just as are front-foot based assessments. We agree that appraisal-based assessments and front-foot based assessments are not wholly dissimilar. We believe that this is so, however, not because both are legislative, but rather because both have quasi-judicial aspects requiring findings of adjudicative facts. *See, e.g., Donocam Assoc. v. Wash. Sub. San. Comm'n,* 302 Md. 501, 489 A.2d 26 (1985). Thus, the City's unsupported contention that "[p]rior to the decision of the Court of Special Appeals, case law had consistently held that special assessments are legislative actions," (City's brief at 31) is incorrect.

In *Donocam,* this Court specifically rejected the claim that "the setting of front-foot benefit charges is a legislative action and that such action is not reviewable as a contested case." 302 Md. at 512, 489 A.2d at 31. *Donocam* involved a front-foot benefit assessment levied by the Washington Suburban Sanitary Commission for a sewage system. The controlling statute required the Commission to hold a hearing prior to levying any special assessments. With regard to that hearing, this Court stated as follows (302 Md. at 513, 489 A.2d at 32):

"What is the purpose of the hearing? Surely it must be something more than an opportunity for a property owner to cry out in rage and frustration at what he may regard as unreasonably high costs. We believe it to be an opportunity for a property owner to present his contentions and to have a ruling relative to the correctness of an assessment. His contentions may rest on several grounds. He may contend

... that no assessment should be made.... It likewise would be an opportunity for him to suggest that a mathematical error had been made. We believe that all of these various possibilities, including, specifically, the right to contend that *any* assessment is erroneous, give rise to a determination by the agency of the rights and duties of property owners. Hence, we conclude that the proceedings before the Commission were a 'contested case'....."

*See also Medical Waste v. Maryland Waste, supra,* 327 Md. at 610, 612 A.2d at 248; *Sugarloaf v. Waste Disposal, supra,* 323 Md. at 672, 594 A.2d at 1130.

Thus, the levy of special benefit assessments based on front footage has adjudicative aspects, such as determining the amount of front footage a particular piece of property has. Additionally, this Court has held that even a front-foot assessment must be levied in relationship to the special benefit accruing to the property assessed. *Montgomery County v. Schultze, supra,* 302 Md. at 491–492, 489 A.2d at 21. Consequently, we believe that the Court of Special Appeals, in noting a distinction between appraisal-based assessments and front-foot based assessments, was doing no more than recognizing that appraisal-based assessments might involve greater inquiry into adjudicatory facts. This recognition does not, however, alter the principal that both have quasi-judicial aspects.

Because the 1993 hearing was adjudicative in nature, Woodmont had a right of cross-examination. The Council erred when it summarily denied Woodmont's requests to exercise that right.

### B.

The City alternatively argues that even if Woodmont should have been afforded an opportunity to cross-examine the City's appraisers, the special assessments should not be voided because Woodmont was afforded "fundamental fairness." (City's brief at 33). The City claims that Woodmont was not prejudiced by the denial of its right of cross-examination because

"Woodmont was given a full and complete opportunity to comment on, and criticize the appraisals prepared for the City and to present its own appraisals, both in writing and through the live testimony of three expert witnesses who testified for over an hour.... Woodmont was then allowed additional time to submit information and to respond to the written critique of its expert's appraisals made by the City appraisers." (*Id.* at 34–35).

This argument must fail, however, because this Court has repeatedly held that the opportunity to present testimony is ordinarily not an adequate substitute for cross-examination. As our predecessors stated in *Town of Somerset v. Board, supra*, 245 Md. at 66, 225 A.2d at 302–303:

"In the words of Mr. Justice Lamar, in *Interstate Commerce Comm'n v. Louisville & N.R.R. Co.*, 227 U.S. 88, 93 [33 S.Ct. 185, 187–188, 57 L.Ed. 431] (1913): '[T]he more liberal the practice * * * the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended * * * All parties must be fully apprised of the evidence submitted or to be considered, and must be given the opportunity to cross-examine witnesses * * * In no other way can a party maintain its rights or make its defense.' The right of a party to call hostile witnesses as its own after the testimony of the adverse party has been completed, in our opinion, is not the substantial equivalent of the right to cross-examine immediately after the direct testimony of the witness has been concluded. The techniques of advocacy so essential to our system of justice are largely stultified when resort must be had to such a cumbersome and delayed substitute for immediate and direct cross-examination."

*See Bryniarski v. Montgomery County*, 247 Md. 137, 148–150, 230 A.2d 289, 296–297 (1967). *See also Birckhead v. Bd. of Co. Comm'rs, supra*, 260 Md. at 600, 273 A.2d at 136 (1971) ("Ordinarily, the opportunity of denial and rebuttal is not a substitute for cross-examination but in view of the peripheral and oblique nature and type of the information sought and received, we find no deprivation of fundamental procedural

rights in the Council's limiting the protestants to written rebuttal on the legislative aspects of the case.").

■ In this case, merely giving Woodmont the opportunity to criticize the City's appraisals and to present its own evidence was not an adequate substitute for the right to challenge the City's evidence through cross-examination. If the City's appraisers were not available as witnesses, through no fault of the City's, a different result might be called for, depending upon the circumstances. Under the circumstances of this case, however, Woodmont's request for the presence of the City's appraisers and cross-examination was reasonable. The Council erred in summarily denying that request.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND VACATED IN PART, AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND TO REMAND THE CASE TO THAT COURT WITH FURTHER DIRECTIONS TO REVERSE THE DECISION OF THE MAYOR AND COUNCIL OF ROCKVILLE AND REMAND THE CASE TO THE MAYOR AND COUNCIL OF ROCKVILLE FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND COUNCIL OF ROCKVILLE.*